JOHN J. POLILLO, A RESIDENT AND TAXPAYER OF THE
CITY OF ATLANTIC CITY, PLAINTIFF-APPELLANT, v.
ADELAIDE DEANE, CLERK OF THE CITY OF ATLAN-
TIC CITY, CARL A. VALORE, SR., CLERK OF ATLANTIC
COUNTY, SETH GROSSMAN, JAMES W. MASLAND, III,
REESE PALLEY, HARRY BACHEN, MEMBERS OF THE
ATLANTIC CITY CHARTER STUDY COMMISSION, *ET
AL.*, DEFENDANTS-RESPONDENTS.

Argued May 24, 1977—Decided October 19, 1977.

Mr. Adrian M. Foley, Jr., argued the cause for appellant (Messrs. McElroy, Connell, Foley and Geiser and Messrs. Goldenberg & Mackler, attorneys; Mr. Foley and Mr. Harry A. Goldenberg, of counsel; Mr. R. Peter Connell, on the brief).

Mr. David J. Goldberg argued the cause for respondents Grossman, Masland, Palley and Bachen (Messrs. Warren, Goldberg and Berman, attorneys).

The opinion of the court was delivered by

PASHMAN, J. This case involves the applicability of the recently enacted "Open Public Meetings Act," or Sunshine Law, N. J. S. A. 10:4–6 et seq., to charter commissions which are governmental bodies established pursuant to N. J. S. A. 40:69A–1 et seq. for the purpose of adopting a new form of government in a municipality.

I

## THE ATLANTIC CITY CHARTER STUDY COMMISSION

One year after the 1911 legislative enactment of the Walsh Act, N. J. S. A. 40:70–1 et seq., Atlantic City voters adopted the commission form of government as outlined in that Act. Recent questioning of the continued utility of the

city's form of government culminated on May 11, 1976 when the citizens of Atlantic City voted to reconsider their present form of municipal government. Utilizing the procedure established in the Optional Municipal Charter Law, *N. J. S. A.* 40:69A–1 *et seq.*, ("Faulkner Act"), the voters approved the formation of a charter commission to study the problem of selecting a form of government for their city. It was empowered under the Faulkner Act to

study the form of government of the municipality, to compare it with other available forms under the laws of this State, to determine whether or not in its judgment the government of the municipality could be strengthened, made more clearly responsive or accountable to the people or whether its operation could be more economical or efficient, under a changed form of government.

[*N. J. S. A.* 40:69A–7]

Five persons were elected to serve on the charter commission: Seth Grossman, James W. Masland, Reese Palley, Harry Bachen, and John J. Polillo. In order to fulfill its statutory purpose, the Commission held 27 regular meetings between May 13 and September 3, 1976. In addition, a meeting was held at Commissioner Polillo's home in the third week of July and an "emergency situation" caused another meeting to be held on September 3, 1976, just prior to the regularly scheduled meeting. See *infra* at 567 n. 2. The Commission filed its final report with the City Clerk on September 3, 1976, within the nine-month period set by the Faulkner Act. *N. J. S. A.* 40:69A–10.

The Commission's activities, however, were marked by dissension. In particular, there was vigorous debate led by plaintiff, Commissioner John J. Polillo, over alleged violations of the Sunshine Law. He had informed his colleagues at several meetings that they had failed to conform to the dictates of the Act. At the August 5, 1976 meeting a motion was passed to remove Polillo from the room after they had argued that the Commission's meeting was in violation of the Sunshine Law. Polillo also sent a letter to the Attorney General on August 12, informing him of this violation. At

the August 19 meeting, he complained that the Commission had failed to supply the public with an agenda of the meeting.

Essentially, plaintiff argues that the public notice accompanying each of the Commission's meetings failed to comport with the procedures required by the Sunshine Law.[1] In fact, notice of each meeting did not follow any set form. Although most meetings were publicized in some form by local newspapers, no formal notice was given of at least three of the meetings,[2] and many notices which were published failed to disclose the Commission's agenda.

[1] *N. J. S. A.* 10:4-8(d) defines "adequate notice" as:
. . . written advance notice of at least 48 hours, giving the time, date, location and, to the extent known, the agenda of any regular, special or rescheduled meeting, which notice shall accurately state whether formal action may or may not be taken and which shall be (1) prominently posted in at least one public place reserved for such or similar announcements, (2) mailed, telephoned, telegrammed, or hand delivered to at least two newspapers which newspapers shall be designated by the public body to receive such notices because they have the greatest likelihood of informing the public within the area of jurisdiction of the public body of such meetings, one of which shall be the official newspaper, where any such has been designated by the public body or if the public body has failed to so designate, where any has been designated by the governing body of the political subdivision whose geographic boundaries are coextensive with that of the public body and (3) filed with the clerk of the municipality when the public body's geographic boundaries and coextensive with that of a single municipality, . . . .

[2] Three of the meetings for which no notice was given to the public were designated as "emergency situations." The first occurred on May 13, 1976, the first official meeting of the Commission. Commissioner Grossman explained that the emergency was caused by the fact that he had military duty in two weeks and another Commissioner was going on a trip the following week. He concluded that this might interfere with their statutory obligation to select a chairperson within 15 days. *N. J. S. A.* 40:69A-5. The second meeting for which no notice was given occurred at Polillo's home. This meeting was attended only by Commissioners Polillo, Grossman and Masland. The final "emergency" meeting occurred on September 3, 1976, immediately prior to the Commission's final meeting, at which the report was released to the public.

Almost immediately after the Commission's report was released, Polillo filed suit challenging its legitimacy under the Sunshine Law. On September 23, 1976, he filed a complaint in lieu of prerogative writ in the Law Division, naming as defendants: Commissioners Grossman, Masland, Palley and Bachen; Adelaide Deane, Clerk of the City of Atlantic City; Carl A. Valore, Clerk of Atlantic County; Joseph Lazarow, Mayor of the City of Atlantic City; and Horace Bryant, Pierre Hollingsworth, Edmund Colanzi and Edwin Roth, Commissioners of the City of Atlantic City.

The trial judge concluded that a charter commission is more than a purely advisory body and was thus within the coverage of the Sunshine Law, *N. J. S. A.* 10 :4–6 *et seq.* He also held that each meeting conducted by the Commission failed to meet the requirements of the Act. The court rejected defendants' alternative contention that even if the Act were applicable, substantial rather than strict compliance was sufficient. The trial court ordered that the public question dealing with the Commission's recommendation be struck from the November ballot.[3]

Defendants obtained a stay of the trial judge's order from the Appellate Division. Although the appeal was heard on an accelerated basis, the election was held before the Appellate Division could render a decision. On November 2, 1976, the voters of Atlantic City approved the Commission's recommendation by a vote of 7,808 to 5,565.

The Appellate Division subsequently issued a *per curiam* decision reversing the trial judge and holding the Sunshine Law inapplicable to a charter commission established pursuant to the Faulkner Act. Specifically, it held that such commissions neither perform governmental functions nor are au-

---

[3]The Faulkner Act provides that the Commission's recommendation as to the form of government to be adopted must be submitted to the voters of the municipality at either a general or special election. *N. J. S. A.* 40 :69A–14, 15. The question is placed on the ballot in the same manner as any other public question. *N. J. S. A.* 40 :69A–14.

thorized to spend public funds. The Appellate Division thus never reached the issue of the Commission's compliance with the Act. We granted certification, 74 *N. J.* —— (1977), and stayed the election scheduled for May 10, 1977 the purpose of which was to elect a mayor and seven councilmen, as recommended by the Commission and authorized by the vote of November 2, 1976.

We reverse the judgment of the Appellate Division.

## II

### *THE SUNSHINE LAW*

A. *Statutory Purpose*

The current "Open Public Meetings Act" is in keeping with a strong tradition both in this State and in the nation favoring public involvement in almost every aspect of government. In New Jersey the former "Right to Know Law" was passed in 1960, *L.* 1960, *c.* 173, and interpreted to apply to a broad variety of governmental agencies. *See Kramer v. Bd. of Adjustment of Sea Girt,* 80 *N. J. Super.* 454 (Law Div. 1963), aff'd 45 *N. J.* 268 (board of adjustment); *Wolf v. Zoning Bd. of Adjustment of Park Ridge,* 79 *N. J. Super.* 546, 552 (App. Div. 1963) (same); *Tidewater Oil Co. v. Mayor, etc., of Carteret,* 80 *N. J. Super.* 283 (Law Div. 1963), rev'd on other grounds, 44 *N. J.* 338 (1960) (planning board); *Thomas v. Bergen Cty. Welfare Board,* 122 *N. J. Super.* 371 (App. Div. 1973) (welfare board); *Schults v. Bd. of Ed. of Teaneck,* 86 *N. J. Super.* 29 (App. Div. 1964), aff'd 45 *N. J.* 2 (1965) (board of education). Legislation similar to our own now exists in virtually every state as well as in the District of Columbia. *See* Note, "Government in the Sunshine Act: Opening Federal Agency Meetings," 26 *Am. U. L. Rev.* 154 (1976). The importance and widespread acceptance of the aims of such legislation are further underscored by the fact that the recently enacted federal law on this subject, the "Government in the Sunshine Act," 5 *U. S. C.* § 551 *et seq.,* was

passed by an overwhelming majority in the House of Representatives and by a unanimous vote in the Senate. *Id.* at 155, n. 4.

 Although state legislation in this area has proliferated only in the last decade,[4] the common law origins of this important policy may be traced to English law dating back to the first half of the 18th century. *See* the Attorney General's Committee on the Right to Know, *New Jersey's Right to Know: A Report on Open Government* at 7 (1974). In this State, courts have long recognized a common law right to public information. *See Ferry v. Williams,* 41 *N. J. L.* 332 (Sup. Ct. 1879) ; *Taxpayers Assoc. v. City of Cape May,* 2 *N. J. Super.* 27 (App. Div. 1949) ; *Moore v. Bd. of Chosen Freeholders of Mercer County,* 76 *N. J. Super.* 396 (App. Div. 1962), modified 39 *N. J.* 26 (1962). The broad reach of this right was noted by Mr. Justice Mountain, writing for the Court in *Irval Realty v. Bd. of Pub. Util. Commissioners,* 61 *N. J.* 366 (1972), when he stated that "a citizen had an enforceable right to require custodians of public records to make them available for reasonable inspection and examination," even though his interest may not have been "purely personal" or was "slight." 61 *N. J.* at 372. Additionally, several commentators have argued that the public's "right to know" is of constitutional dimension. *See, e. g.,* Levi, "Confidentiality and Democratic Government," 30 *The Record* 323, 326 (1975) ; Note, *supra,* 26 *Am. U. L. Rev.* at 203–06; and authorities cited in Note, "Open Meeting Statutes: The Press Fights for the 'Right to Know,'" 75 *Harv. L. Rev.* 1199, 1204, n. 33 (1966).

The policy reasons for opening up government to the public have been expressed on numerous occasions throughout this nation's history. Foremost among them is the goal of

---

[4]It is reported in Note, *supra,* 26 *Am. U. L. Rev.* at 154, n. 3 that in 1950 the only state to have such a law was Alabama, but that by 1976, the only state to be without one was New York. That state has since enacted an open meetings law. N. Y. Pub. Officers Law §§ 90–101 (McKinney Supp. 1976).

fulfilling our cherished ideal of creating a "government of the people." James Madison wrote:

A popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives.

> [Letter to W. T. Barry, Aug. 4, 1822, in 9 *Writings of James Madison* 103 (G. Hunt ed. 1910)]

DeTocqueville felt that these same ideas were fundamental to the American tradition. In his perceptive commentaries about our system of government, he observed:

It is by taking a share in legislation that the American learns to know the law; it is by governing that he becomes educated about the formalities of government. The great work of society is daily performed before his eyes, and so to say, under his hands.

> [A. DeTocqueville, *Democracy in America* 304 Doubleday & Co., Inc. (1848 ed.)]

A second reason for conducting government in the "sunshine" is that it prevents corruption. Few persons would disagree with Woodrow Wilson's statement that "corruption thrives in secret places, and avoids public places." F. Rourke, *Secrecy and Publicity* 25 (1961) (quoting Wilson in *The New Freedom* 92–104). *See* Markham, "Sunshine on the Administrative Process: Wherein Lies the Shade," 28 *Admin. L. Rev.* 463 (1976); Tacha, "The Kansas Open Meeting Act: Sunshine on the Sunflower State?" 52 *Kan. L. Rev.* 169 (1977). Former Chief Justice Warren viewed the Watergate scandal as an unfortunate confirmation of the truth of Woodrow Wilson's observation. He stated:

It would be difficult to name a more efficient ally of corruption than secrecy. Corruption is never flaunted to the world. In government it is invariably practiced through secrecy — secrecy found in every level of government from city halls to the White House and Capitol. If anything is to be learned from our present difficulties,

compendiously known as Watergate, it is that we must open our public affairs to public scrutiny on every level of government.

[Warren, *Governmental Secrecy*: *Corruption's Ally*, 60 *A. B. A. J.* 550 (1974)]

Surely these principles are more than mere abstract expressions of some illusory ideal. We believe that the Act before the Court today reflects a legislative intention to incorporate such precepts into the very fabric of government in this State. In its statement of findings and declaration to the "Open Public Meetings Act" the Legislature stressed the importance which it attached to the policies which the new law was to implement:

The Legislature finds and declares that the right of the public to be present at all meetings of public bodies, and to witness in full detail all phases of the deliberation, policy formulation, and decision making of public bodies, is vital to the enhancement and proper functioning of the democratic process; that secrecy in public affairs undermines the faith of the public in government and the public's effectiveness in fulfilling its role in a democratic society, . . . .

[*N. J. S. A.* 10 :4–7]

It further declared

it to be the public policy of this State to insure the right of its citizens to have adequate advance notice of and the right to attend all meetings of public bodies at which any business affecting the public is discussed or acted upon in any way except only in those circumstances where otherwise the public interest would be clearly endangered or the personal privacy or guaranteed rights of individuals would be clearly in danger of unwarranted invasion.

The Legislature further declares it to be the public policy of this State to insure that the aforesaid rights are implemented pursuant to the provisions of this act so that no confusions, misconstructions or misinterpretations may thwart the purposes hereof.

[*Id.*]

B. *Applicability of the Act to Charter Commissions.*

The Sunshine Law provides that

it is the understanding and the intention of the Legislature that in order to be covered by the provisions of this act a public body must

be organized by law and be collectively empowered as a multi-member voting body to spend public funds or affect persons' rights; that, therefore, informal or purely advisory bodies with no effective authority are not covered, nor are groupings composed of a public official with subordinates or advisors, who are not empowered to act by vote such as a mayor or the Governor meeting with the department heads or cabinet members, that specific exemptions are provided for the Judiciary, parole bodies, the State Commission of Investigation, and political party organizations, . . .

[*Id.*]

*N. J. S. A.* 10:4–8(a) further defines "public body" to include a "commission . . . organized under the laws of this State, and collectively empowered as a voting body to perform a public governmental function affecting the rights, duties, obligations, privileges, benefits, or other legal relations of any person, . . . ." Thus, the only arguable basis for exempting charter commissions from the act might be an alleged inability to affect persons' rights or privileges. However, we regard the substantial authority delegated to a charter commission[5] under the Faulkner Act as foreclosing any such contention.

A charter commission effectively controls the ultimate options which the voters have regarding their choice of a form of government. It determines which form of government shall be voted upon, when such a vote shall be taken and how the question shall be framed to the electorate.[6] A charter com-

---

[5] A charter commission meets the statutory criteria in all other respects. It is a multi-member commission, *N. J. S. A.* 40:69A–2, which is organized under the laws of this State, *N. J. S. A.* 40:69A–1 *et seq.*, and is a collectively empowered voting body, *N. J. S. A.* 40:69A–5.

[6] *N. J. S. A.* 40:69A–15 provides:

If the charter commission shall recommend that the question of adopting one of the optional forms of government authorized by articles 3 through 16, inclusive, and 12A of this act shall be submitted to the voters of the municipality, it shall be the duty of the municipal clerk to cause the question of adoption or rejection to be placed upon the ballot at such time as the commission shall in its report specify. The commission may cause the ques-

mission may also affect the voters in far more subtle ways. As the body authorized to study various forms of municipal government and compare them with that presently in existence, *N. J. S. A.* 40:69A–7, a charter commission is able to exert considerable influence over the electorate. It enjoys a unique opportunity to make its views known and to shape voter preferences by use of its power to control hearings, *N. J. S. A.* 40:69A–9, and by the recommendations which it ultimately makes, *N. J. S. A.* 40:69A–12. *Cf. Showell v. Horn,* 65 *N. J. Super.* 374, 383 (Law Div. 1961) (commission may give more weight to one option than another by dealing with it more extensively in its report).

While the authority vested in such a commission does not allow it to legislate or impose its choice on the voters,[7] *see Bucino v. Malone,* 12 *N. J.* 330, 340 (1953), a governmental body's powers need not extend that far in order to be covered by the Sunshine Law. The Act, although it exempts informal or purely advisory bodies with no effective authority, does extend to a public body which is empowered to spend public funds or "affect persons' rights." Thus, the power of the Commission herein to influence in a material way a person's vote concerning a proposed form of govern-

tion to be submitted to the people at the next general or regular municipal election, occurring not less than sixty days following the filing of a copy of the commission's report with the clerk, or at a special election occurring not less than sixty days or more than one hundred twenty days after the filing of the report, at such time as the commission's report shall direct. At such election the question of adopting that form of government recommended by the charter commission shall be submitted to the voters of the municipality in the same manner as other public questions to be voted upon by the voters of a single municipality. The charter commission shall frame the question to be placed upon the ballot as provided in section 1–14 [*N. J. S. A.* 40:69A–14] and, if it deems appropriate, an interpretative statement to accompany such question.

[7] The Faulkner Act provides that the voters may adopt any of the optional plans provided by the act by petition and referendum without a charter commission. *N. J. S. A.* 40:69A–18.

ment is sufficient to bring its activities within the Sunshine Law. *See generally, State v. Hurd,* 5 *Wash.* 2d 308, 105 *P.* 2d 59, 61 (Sup. Ct. 1940) (defining "affect" as to "influence . . . concern . . . [or] touch."); *Bd. of Directors of Cushing Consolidated School Dist. v. Bd. of Education In and For Ida County,* 251 *Iowa* 371, 101 *N. W.* 2d 27, 29 (Sup. Ct. 1960) ("affect" defined as " 'to act or produce an effect upon, to touch' "); 2A *C. J. S.* Affect, pp. 430–31 (1972) ("affect" defined as "to influence . . . concern . . . [or] touch."); *Webster's Third International Dictionary* 35 (1971) (synonymous with "influence, touch, impress").

█ We believe that application of the Sunshine Law to charter commissions would be entirely consistent with the legislative intent as expressed in the Faulkner Act. *N. J. S. A.* 40:69A–9 provides that a

charter commission shall hold public hearings, may hold private hearings and sponsor public forums and generally *shall provide for the widest possible public information and discussion respecting the purposes and progress of its work.*

[emphasis added]

Contrary to the conclusion reached by the Appellate Division, the Sunshine Law would not impliedly repeal the clause allowing a charter commission to hold private hearings. The requirement of the Faulkner Act that a charter commission must "provide for the widest possible public information and discussion" should be read in the context of the Open Public Meetings Act which prescribes guidelines and permits a commission to conduct private hearings whenever that course would be appropriate.[8] This interpretation would be in keep-

---

[8]Under the Sunshine Law there is a comprehensive list of instances where public participation is not required. A commission might conduct a private hearing if it is dealing with information which, if released, would violate its confidential nature, would impair the ability of a governmental body to receive federal funds, or would constitute an invasion of privacy; moreover, the Act provides additional exemptions for discussions covering the terms and conditions

ing with our duty to read statutes in *pari materia* and thus harmonize them whenever possible. *See Commercial Trust Co. v. Adelung,* 137 *N. J. Eq.* 541 (E. & A. 1945); *Accardi v. Mayor & Council of North Wildwood,* 145 *N. J. Super.* 532, 545 (Law Div. 1976).

Accordingly, we hold that a charter commission is the type of governmental agency which should be covered by the Act. Such bodies are largely responsible for shaping the form of government in many cities and towns. The educational value to the public in allowing it to have access to commission hearings and deliberations is obvious. By witnessing the deliberative processes of the commission, the people who ultimately must choose a form of government have the opportunity to learn first-hand the policy considerations which influenced the commissioners. Unless the electorate is to follow blindly the recommendation of the charter commission, the voters must be allowed to follow its progress and have access to the information considered by the commission in arriving at its decision.

Moreover, the importance of the case at hand to the public cannot be over-estimated. It must be remembered that the decision as to a form of government will inevitably affect the entire democratic structure in that municipality. Surely the legislative concern for the "enhancement and proper functioning of the democratic process," see *ante* at 572, must be of

---

of collective bargaining agreements, the acquisition of real property with public funds, the setting of bank rates or investment of public funds, violations of the law or tactics utilized in protecting public property, pending or anticipated litigation involving the public, employment, appointment or termination of any public officer or employee, the possible imposition of a civil penalty or loss of a license; and lastly, any matter covered by the attorney-client privilege is not covered by the Act. *N. J. S. A.* 10:4–12. Consequently, we cannot believe that a charter commission acting in compliance with the Sunshine Act would be hampered in any way in its official functions.

substantial, if not decisive, weight in our resolution of this question.

### III

*FAILURE OF THE ATLANTIC CITY CHARTER
COMMISSION TO COMPLY
WITH THE SUNSHINE LAW*

As the Appellate Division correctly noted, the trial judge found that "each and every meeting conducted by the commission violated the Act, particularly *N. J. S. A.* 10:4–9 and 10, in one or more ways, including the failure to give adequate notice of meetings." This finding of fact is not disputed by defendants who concede that the vast majority of their meetings technically violated the Act. Thus, the only question remaining is the significance which should attach to these violations.

The thrust of defendants' argument is that the Court should uphold the Commission's recommendation on the basis of its substantial compliance with the Sunshine Law. They assert (1) that there was no attempt "to meet secretly or without some notice to the public," as found by the Appellate Division, and (2) that any meeting at which formal votes were taken complied with the Act, thereby satisfying the requirements of the law. Although, on these facts, we impute to the Commission no wrongful motivation for choosing to conduct its business as it did, lack of wrongful intent cannot excuse noncompliance with the Act. Such a reading of the statute would invite abuse and would contravene the legislative intent in enacting the provision.

*N. J. S. A.* 10:4–15 specifies that any governmental action shall be declared void "if the court shall find that the action was taken at a meeting which does not conform to the provisions of this act, . . . ." Contrary to defendants' assertion that there is an exception to the Act where there is substantial compliance with its provisions, *N. J. S. A.* 10: 4–8(d) spells out in detail what must be done in order to

provide the public with "adequate notice." Additionally, in place of the narrow exceptions to the law found in *N. J. S. A.* 10:4–9 (dealing with emergencies) and 12, see *ante* at 575, n. 8, defendants would allow a charter commission or any other governmental agency to disregard the dictates of the law whenever there would be "substantial compliance." Rather than providing a new exception to the rule, we believe that defendants' suggestion would swallow the rule. Accordingly we reject this argument completely and hold that strict adherence to the letter of the law is required in considering whether a violation of the Act has occurred.

■ Acceptance of defendants' final contention that we need look only at the notice given before the last two meetings — when the Commission took formal action — would undermine the entire purpose of the Act. This would allow an agency to close its doors when conducting negotiations or hammering out policies, and then to put on an appearance of open government by allowing the public to witness the proceedings at which its action is formally adopted. Such, an interpretation of the statute would conflict with *N. J. S. A.* 10:4–15 (a) which provides that "a public body may take corrective or remedial action *by acting de novo* at a public meeting held in conformity with this act." [Emphasis added.] Surely it cannot be realistically contended that the September 2 and 3 meetings constituted a *"de novo"* reaffirmation of the activities which had transpired at the previous meetings. Consequently, even assuming the Commission did comply with the Act at these last two meetings,[9] we do not believe that its actions were sufficient to correct the past violations which the trial judge found.

## IV

## THE REMEDY

In view of the finding that the Act has been violated, our attention must now be directed to fixing the appropriate

---

[9] An issue upon which we intimate no view for present purposes.

remedy and relief. *N. J. S. A.* 10:4–15 provides that any action taken by a public body at a meeting which does not conform to the provisions of the Act shall be voidable. However, as stated above, the public body may take corrective or remedial action by proceeding *de novo* at a public meeting held in conformity with the statute. *N. J. S. A.* 10:4–16 also states that the court shall issue such orders and provide such remedies as shall be necessary to insure compliance with the provisions of the Act.

These remedial statutory sections contemplate maximum flexibility in rectifying governmental action which falls short of the standards of openness prescribed for the conduct of official business. Consistent with the breadth and elasticity of relief provided in the legislative scheme, it is entirely proper to consider the nature, quality and effect of the noncompliance of the particular offending governmental body in fashioning the corrective measures which must be taken to conform with the statute. Thus, in this context, the "substantial compliance" argument of defendants carries some weight on the question of remedy and relief. As pointed out, several commission meetings were held as to which there was public notice, albeit insufficient to satisfy the statute. Most meetings did involve the wide participation of the public. Many were held at various locations to enhance the access of the public and serve the convenience of the people. Most meetings did not involve any deliberative or executive action by the Commission but rather provided a forum for the presentation of the testimony and evidence of experts and other witnesses which have become part of a permanent and public record.

We have observed that the spirit of the Open Public Meetings Law was not seriously undermined by a great deal of the work of this Commission. And there is no suggestion that the Commission did not satisfy fully its intended purpose under the Faulkner Act as it stood prior to the implied amendment of that statute by the Open Public Meetings Law.

Nevertheless, we must invalidate the final governmental action taken by the Commission, namely, its actual recommendation as to the form of government to be placed upon the ballot and the antecedent meetings at which the Commissioners deliberated and reached their conclusion. However, we do not find it necessary, in fashioning a remedial solution, to invalidate and repudiate all other public meetings, particularly those hearings at which testimony and evidence were received.

Therefore, the Commission is directed to embark again upon its task of considering an appropriate form of government to be recommended by it for approval by the voters. In so doing, it may in its sound discretion utilize so much of the testimony and evidence which it acquired in the course of its original effort as it deems necessary and appropriate. However, any decision in that regard must be arrived at in a manner in strict conformity with the Open Public Meetings Law so that the public may be fully apprised by adequate notice and a publicized agenda exactly what prior meetings and what aspects of the existing Commission record are sought to be so utilized. The Commission may hold additional meetings for the purpose of either supplanting or supplementing its prior efforts, again in strict compliance with the Open Public Meetings Law. Finally, any recommendation to be proposed by the Commission, after adopting the results of such prior meetings and developing evidence from any additional meetings as provided here, shall be adopted only at any concluding meeting or meetings which, to reiterate, satisfy the standards of the Act in every respect.

We further determine and direct, in order to assure continuity of government, that the status quo be preserved pending the final recommendation of the Commission and the action of the electorate as to a form of government for the City of Atlantic City.

Reversed and remanded for proceedings in accordance with this opinion.

CLIFFORD and HANDLER, JJ., dissenting: We would affirm the judgment substantially for the reasons expressed in the opinion of the Appellate Division.

*For reversal and remandment*—Justices MOUNTAIN, SULLIVAN, PASHMAN and SCHREIBER—4.

*For affirmance*—Justices CLIFFORD and HANDLER—2.