166 N.J. Super. 357 (1979)
399 A.2d 1034
LINDA JENKINS AND CAROL A. GRAVES AS INDIVIDUALS AND NEWARK TEACHERS UNION, LOCAL 481, A.F.T. AFL/CIO, AND OTHERS SIMILARLY SITUATED, PLAINTIFFS,
v.
NEWARK BOARD OF EDUCATION, CITY OF NEWARK, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided January 12, 1979.
*359 Messrs. Liss and Meisenbacher for plaintiffs (Mr. Eugene G. Liss, of counsel)
Mr. Cecil J. Banks for defendant.
YANOFF, J.S.C.
This opinion is written pursuant to R. 2:5-1(b) as amplification of an oral opinion rendered on January 12, 1979 at the conclusion of the trial in the above matter.
Three issues are raised in the case, only one of which is of significance. The first is whether "adequate notice" to the public, required by the Open Public Meetings Act, of meetings of the Newark Board of Education (board) on December 8 and 15, 1978 (N.J.S.A. 10:4-6 et seq.) was excused by reason of emergency. A second issue raised by the pleadings, whether the employees of the board were entitled to specific notice of termination of employment by the provisions of N.J.S.A. 10:4-12(b)(8), need not be resolved in view of my holding that the board did not satisfy the requirements of an emergency meeting under §§ 9 and 10 of the statute. In any event, its significance in the litigation is sharply diminished by reason of Rice v. Union Cty. Regional High School Bd. of Ed., 155 N.J. Super. 64 (App. Div. 1977), certif. den. 76 N.J. 238 (1978). The third issue raised by the trial brief, but not pressed at oral argument at the conclusion of the case, that "the Court is without subject matter jurisdiction to consider issues raised by the plaintiffs under the Public School Education Act" by reason of N.J.S.A. 18A:6-9, which confers jurisdiction *360 upon the Commissioner of Education to hear controversies under the school laws, will be discussed infra.
The Open Public Meetings Act requires that "adequate notice" to the public be given of the transaction of "public business" by a "public body." The statute defines "adequate notice" as "written advance notice of at least 48 hours * * *." N.J.S.A. 10:4-8.
The question of when the giving of 48-hours' notice is excused by reason of what is called "emergency" has received consideration only in Dunn v. Laurel Springs, 163 N.J. Super. 32 (App. Div. 1978). There it was held (at 36) that an additional cost of $1200 for an election did not constitute "`substantial' harm" authorizing dispensation of the 48-hour notice requirement, "especially when balanced against the harm done from failing to give adequate notice to the public." In Polillo v. Deane, 74 N.J. 562 (1977), "emergency situations" were involved, but the court, in its holding that the Open Public Meetings Act applied to charter commissions, did not find it necessary to discuss the applicable provisions of the statute, except to observe (at 578) that § 9 of the statute involves "narrow exceptions to the law * * *."
The issue is whether, bearing in mind the purposes of the statute explicitly set forth in N.J.S.A. 10:4-7, and expounded in decisions of this State, particularly Polillo v. Dean, supra, there existed a situation which justified the board in failing to give "adequate notice" as required by the statute.
To refine the issue further, I find as a fact that the board complied with all the technical requirements of § 9 for an "emergency meeting" in so far as giving of notice, required vote of the members, statements made at the meeting, and limitation of the discussion and actions at the meeting to matters considered of urgency and importance. There is no need to discuss the factual basis for this conclusion, since it favors the party against whom the ultimate ruling is made.
*361 However, I find that the prerequisites for an "emergency meeting" were not present in this case. In Dunn, supra, the court stated:
* * * we reject the notion that an emergency existed here. N.J.S.A. 10:4-9(b) allows an emergency meeting to be held where
"(1) such meeting is required in order to deal with matters of such urgency and importance that a delay for the purpose of providing adequate notice would be likely to result in substantial harm to the public interest * * *."
The Attorney General has defined an emergency situation in terms of a "crisis." He states further "It may be that the need for such a meeting is great but the emergency not of such nature as to require an immediate meeting." Attorney General Formal Opinion No. 29 (1976) at 8 [163 N.J. Super. at 35]
What this means is that it is a question of judgment for the finder of facts as to whether the urgency is sufficient to warrant noncompliance with the 48-hour notice requirement of the Open Public Meetings Act.[1]
Most of the facts are not susceptible to dispute. The board operates on a fiscal period of July 1 to June 30. Its budget is approximately $150 million. For the fiscal period ending June 30, 1977 it had a deficit of approximately $1 million. This increased to approximately $4.6 million by June 30, 1978. In the succeeding fiscal period, ending June 30, 1979, it was operating on a budget which, if not corrected, would result in a shortfall of $6.3 million at the end of the period. Thus, without correction or additional assistance the board would have a deficit of $11 million by June 30, 1979. Cognizant of the problem, the board made application in June 1978 to the Commissioner of Education for leave to amortize the deficit over a four-year period. The application was denied.
*362 It is not clear whether the board's approaches to the City of Newark were made simultaneously with the attempts to obtain the relief from the Commissioner of Education or subsequent thereto. However, it is absolutely certain that the board made attempts prior to December 1978 to have the City of Newark finance its deficit for 1976-1978 and its prospective deficit for 1978-1979. On November 22, 1978 a proposal was considered by the Newark City Council to finance the deficit. It was rejected by a one-vote margin. Alonzo Kittrels, Executive Superintendent of Schools for the City of Newark, testified that in a memorandum to members of the board, dated November 22, 1978, he wrote:
On Monday, November the 27th, 1978, layoff lists will be provided to you for your review. It is my hope that these reductions will be considered and proposed at the November Board action meeting. Clearly layoffs will result in the elimination and modification of educational and supportive services. The program changes requirring [sic] these layoffs will also be provided to you under separate covers prior to the November 28th meeting. I would like to, again, point out the difficulties involved in presenting educational rational [sic] for the elimination of programs and services when, in fact, no rational [sic] existed for the establishment of many of these programs. It should be recognized that the recommendations that we shall present to you on November 27th, and over the next several weeks, should not be viewed as recommendations resulting solely from our financial situation. Without our physical [sic] crisis, we are moving towards various changes in our educational system in order to improve and refine our delivery of services.
He stated further that he would have proposed to make these "program modifications" in an orderly way over a period of time, preferably by attrition, rather than discharge of employees. The proposed program modification set forth in the document to which Kittrels makes reference in general conform closely to the plans which were brought before the board at the challenged meeting on December 8, 1978. A document dated December 1, 1978 contains the same plan of program modification, but with a schedule of employees to be terminated in order to effect a saving of $3.3 million for the fiscal year 1978-1979. So close was the similarity *363 between the December 1 and December 8 plans that, although the termination of approximately 1100 persons was involved, the December 8 plan called for the discharge of only three more regular teachers, three more recreation teachers, five less people in "security services" and no change in the number of attendance counselors, home economic teachers and industrial art teachers.
We come now to the meeting of December 8, 1978. The minutes of the meeting of the municipal council on that date show that it was called on December 6, 1978, pursuant to the Open Public Meetings Act, by reason of a letter from the mayor asking the council to convene "to consider the proposed resolution approving settlement of the appeal by the Board for the reduction of its budget for the school year 1978-1979 * * *." The agenda for the meeting was disseminated on December 6. Contained in the minutes is a draft of an agreement between the mayor and the board, acting by its executive superintendent and president, for a budget "not to exceed $151 million, inclusive of all federal, state and local contributions for all school purposes, for the 1979-1980 school year" (Emphasis supplied). The meeting began at 12:40 P.M. The last item of business taken up was the vote on the school funding resolution, which reads:
Section 1. That the appeal by the Newark Board of Education of the reduction in their budget for the school year 1978-1979 is to be settled, subject to Section 2 herein for $3,000,000. In addition, the City will appropriate the amount of $4,600,000. to fund the Board's deficits for the years 1976-77 and 1977-78.
Section 2. That the Corporation Counsel be and he is hereby authorized to execute all necessary documents including but not limited to the agreement, a copy of which is annexed hereto, to effect the settlement of the aforesaid budgetary matters between the City of Newark and the Newark Board of Education. This settlement is expressly contingent upon the review and execution by the Corporation Counsel of any and all documents he deems necessary to effect the terms of this settlement and protect the interests of the City of Newark.

* * * * * * * * *364 It carried by a vote of 5-4 and the meeting adjourned immediately at 2:45 P.M.
Board officials testified that the board meeting on December 8 was not called until the outcome of the meeting of the municipal council was known, and that the chairman of the board did not leave to attend the board meeting until he was sure that the municipal council had agreed to cover the 1976-1978 deficit and to provide approximately half of the deficit for the period 1978-1979. However, it is beyond dispute that notices of a board meeting for 2 P.M. on December 8 began to go out between 11:00 and 11:30 A.M.
Thus it is clear that by December 6 the officials of the board had negotiated and made an agreement with the mayor settling the finances of the board, not only for the period 1976-1978 but for the period 1979-1980. Among other things, the agreement contained provisions for application of any additional federal or state aid to the reduction of the school board budget, to the end that it would result in an offset against the 1980 tax levy. It was known also that the agreement would be placed before the municipal council on the 8th. With the mayor's support there was a likelihood that it would be carried.
Two possible courses of action for the board suggest themselves: first, issuing a call on the 6th, when the agreement with the mayor had been reached, for a meeting on the 8th to follow the meeting of the municipal council; second, and alternatively, giving notice on the 8th for a meeting on Monday, December 11. Both would have been in full conformity with the 48-hour notice requirement. The position taken by the executive superintendent and the president of the board was that the board could not act until it knew definitively what action had been taken by the municipal council. The superintendent stated that the meeting was called for the 8th because each day's delay in the implementation of the budget reduction would cost approximately $40,000. He argued that the extra cost would have to be met by cutting more staff which, in turn would involve further program *365 revision. This estimate I do not accept as correct. In most cases board of education employees were not paid for the weekend days, so a notice on the 8th addressed to the 11th would not have added substantially to salary costs. Third, additional cost could have been saved if the board had exercised a reasonable amount of foresight. Savings were determined by the dates when notice of termination was given. In some cases the notice required was 30 days, in others more, depending upon whether the employee had Civil Service status or not. In fact, notices of termination were not sent until December 12 or 13. Had the meeting been called for December 11, and the notices prepared in advance, they could have been mailed following board action on the 11th, certainly by the 12th or 13th, the same dates when they were in fact released.
The basic issue is whether calling a meeting on 48-hours' notice "would be likely to result in substantial harm to the public interest". In this case that issue must be considered against the background of a budget of approximately $151 million. Assuming as correct the superintendent's estimate of additional cost of $80,000 by reason of delay from the 8th to the 11th, it is obvious that the percentage of additional cost in a budget of such kind is minuscule.
The inevitable conclusion is that the board had sufficient knowledge and resources in advance of the December 8 meeting to make provision for a meeting on the 11th, in full compliance with the statute, and that it could have done so without increasing the cost or changing the program modification plan.
The Legislature has declared it to be
* * * the public policy of this State to insure the right of its citizens to have adequate advance notice of and the right to attend all meetings of public bodies at which any business affecting the public is discussed or acted upon in any way except only in those circumstances where otherwise the public interest would be clearly endangered or the personal privacy or guaranteed rights of individuals would be clearly in danger of unwarranted invasion. [N.J.S.A. 10:4-7]
*366 See Polillo v. Diane, supra 74 N.J. at 572. This creates an affirmative duty upon a public body to use its resources to fulfill the objectives of the statute. Compliance must be real and not merely formal or technical. "A statute should not be construed to permit its purpose to be defeated by evasion." Accardi v. North Wildwood, 145 N.J. Super. 532, 545 (Law Div. 1976). Whether the exigencies of the occasion in this case justified failure to give 48-hours' notice of the meeting must be determined in the light of the reality of the situation, not an appearance of emergency.
The reality here is that the board had sufficient advance notice that the municipal council would supply an answer to its fiscal problems on December 8, to make provision by appropriate planning to give 48-hours' notice of a meeting on either the 8th or the 11th. Its plans for a budget reduction of $3.3 million were fully prepared prior to the 8th; its lists of employees to be terminated, in readiness; virtually nothing remained to be done to present a complete program to meet the fiscal problem. Why it did not is a matter of conjecture; the fact is that it could have given the 48-hours' notice without significant financial cost had it exerted a reasonable amount of foresight and effort. Finally, even if the cost of compliance with the statute were in fact as large as envisioned by the superintendent, viewed against the total budget involved and the importance of the purposes of the statute, it should have been incurred.
The pleadings also raise in issue the validity of a meeting held by the board on December 15, 1978 at 5 P.M. in the auditorium of the Barringer High School, notice of which was given at about 1 P.M. on the same day. The agenda on the 15th was precisely the same as that on the 8th. The chairman of the board testified that although he believed the meeting of the 8th to have been valid, the meeting was called on the 15th because of a fear that the meeting on the 8th might be considered to be invalid. It was not specified what facts gave rise to this fear or where it originated.
*367 In perspective, the meeting of the 15th is of little importance because the notices of termination in the vast majority of cases were sent out prior to the meeting of the 15th, beginning on the 12th. In a relatively small number of cases duplicate notices were sent out also after the meeting of the 15th.
It would seem reasonable to conclude that if the board called a meeting for the purpose of correcting deficiencies in the meeting of the 8th, it would have exerted every effort to do so properly. This, of course, required the giving of 48-hours' notice. All the reasons which support the conclusion that the meeting of the 8th violated the Open Public Meetings Act support with greater force the conclusion that the meeting of the 15th also violated that statute since the board had an additional week in which to give notice.
The board president's explanation for not giving the requisite notice for the meeting on the 15th was that he had learned only on the 14th that the validity of the meeting on the 8th was in question. It is difficult to accept this as a correct statement of fact. In any event, it is not sufficient in view of a public body's affirmative obligation to comply with the Statute.
The last point to be considered is the argument made in the board's brief that only the Commissioner of Education had authority to consider the matter, by reason of N.J.S.A. 18A:6-9. I recognize that the action of a public body, particularly where it has expertise in an area, is entitled to deference. See, e.g., 17 McQuillin, Municipal Corporations (3 ed. 1967), § 51.69 at 645. Certainly "all controversies and disputes arising under the school laws, excepting those governing higher education * * * are within the jurisdiction of the Commissioner of Education," N.J.S.A. 18A:6-9, and any party aggrieved by the Commissioner's determination may appeal to the State Board of Education, N.J.S.A. 18A:6-27. The Commissioner of Education has the power to direct a municipality responsible for supplying funds to a board of education to increase the municipality's appropriation, *368 N.J.S.A. 18A:22-15. Elizabeth Bd. of Ed. v. Elizabeth, 55 N.J. 501 (1970); Union City Bd. of Ed. v. Union City, 112 N.J. Super. 493 (Law Div. 1970), aff'd 118 N.J. Super. 435 (App. Div. 1972).
Clearly also, the board is, as is every school district, constitutionally mandated to support a thorough and efficient system of education for the children within its district. N.J. Const. (1947), Art. VIII, § IV, par. 1; N.J.S.A. 18A:7A-1 et seq. Were these the matters involved, the court would either not have jurisdiction or would require exhaustion of administrative remedies.
However, the only question involved here is whether the board complied with the Open Public Meetings Act. In no case where action of a board of education was questioned under the Open Public Meetings Act was the argument now raised by the board considered, and certainly in no case has it been sustained. Rice v. Union Cty. Regional High School Bd. of Ed., supra; Dunn v. Laurel Springs, supra; Oliveri v. Carlstadt East Rutherford Bd. of Ed., 160 N.J. Super. 131 (App. Div. 1978); see Accardi v. North Wildwood, supra. Cf. La Fronz and Weehawken Ed. Ass'n v. Weehawken Bd. of Ed., 164 N.J. Super. 5 (App. Div. 1978).
There is no need to make provision for a judgment in favor of plaintiff since one has been entered.
NOTES
[1] I suggest that the words used add little assistance to a decision. The word "crisis" in general means "turning point." Webster's Third New International Dictionary Unabridged (1966).