210 N.J. Super. 370 (1986)
510 A.2d 42
SOUTH HARRISON, TOWNSHIP COMMITTEE MARY ANN ALLS: HERBERT DANNER; WARREN MORGAN; THOMAS SORBELLO; AND RUSSELL MARINO, PLAINTIFFS-APPELLANTS,
v.
BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF GLOUCESTER AND NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 23, 1986.
Decided February 7, 1986.
*371 Before Judges KING, O'BRIEN and SIMPSON.
Lewis Goldshore argued the cause for appellant Township Committee of the Township of South Harrison (Goldshore & Wolf, attorneys; Lewis Goldshore, Marsha Wolf and Robert J. Cash, on the brief).
Bruce C. Hasbrouck argued the cause for respondents Board of Chosen Freeholders of the County of Gloucester (Hasbrouck & Uliase, attorneys).
Harley A. Williams, Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (W. Cary Edwards, Attorney General of New Jersey, attorney; Deborah T. Poritz, Deputy Attorney General, of counsel).
Thomas H. Ward argued the cause for amicus curiae The Gloucester County Times.
Harbourt, Kelly & McTighe filed amicus curiae brief on behalf of New Jersey Farm Bureau (Arthur A. McTighe, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
*372 This appeal challenges the action of the Board of Chosen Freeholders taken on December 28, 1984 amending the Gloucester County Solid Waste Management Plan to designate a site in South Harrison Township as the location of the county-wide landfill. We conclude that the members of the Board violated the Open Public Meetings Law, sometimes called the "Sunshine Law," by attending private meetings on December 10 and 11, and that these violations were not cured by the conduct of the public meeting of December 27 and 28, 1984. We therefore reverse the trial judge and hold the action of the Board in siting the landfill void. Because the Board's action was void, we need not reach the other points on this appeal. Indeed, since the action of the Board was void, the companion appeals,[1] challenging the environmental aspects of the decision made by the Board and approved by the Department of Environmental Protection (DEP) are presently moot and will be dismissed.
Pursuant to the Solid Waste Management Act (SWMA), N.J.S.A. 13:1E-1, et seq., each of the State's 21 counties and the Hackensack Meadowlands were designated as a solid waste district and required to develop a solid-waste management plan. N.J.S.A. 13:1E-20. To assist the board of freeholders in each county the SWMA requires that a Solid Waste Advisory Council (SWAC) be constituted and consulted before a plan or amendment is adopted. N.J.S.A. 13:1E-20b. In addition, the Act requires consultation with the regional, county and municipal agencies responsible for land use and zoning. N.J.S.A. 13:1E-20b.
The original Gloucester County Plan adopted in June 1979 recommended that existing landfills, including Kinsley Landfill, in Deptford be relied upon. This plan was approved by DEP in September 1980. However, Kinsley's capacity continued to diminish quickly and the Board ultimately voted to deny Kinsley's *373 application for expansion in September 1984. At this time, the freeholders turned their attention away from Kinsley and began to think of other potential sites. Meanwhile, a law suit entitled Borough of Glassboro v. Gloucester County Board of Chosen Freeholders, 98 N.J. 186 (1984); 199 N.J. Super. 91 (App.Div.), aff'd 100 N.J. 134 (1985), cert. den. ___ U.S. ___, 106 S.Ct. 532, 88 L.Ed.2d 464 (1985), which made its way eventually to our State's and the federal Supreme Court, ostensibly sealed the fate of Kinsley as a working landfill. On November 13, 1984 Judge DeSimone entered a preliminary injunction which, among other things, directed the county officials to implement an operational landfill within its borders in 12 months. Judge DeSimone's order withstood Commerce Clause and other challenges from the City of Philadelphia, which was barred from Kinsley in November 1984, and also challenges from many Camden County municipalities, which were barred as of January 1, 1986. Today, only Gloucester County residents may dump at Kinsley, with some very minor contribution from Salem County residents.
In late November 1984 the Gloucester County Board of Freeholders hired Speitel Associates as environmental and engineering consultants for the purpose of assisting them in selecting a site and implementing the new county landfill, and then the events concerning us unfolded. The focus of this particular appeal is on two private meetings held on December 10 and 11, 1984 and the public meeting of December 27 and 28.
The December 10 meeting, held at the home of the assistant county counsel for environmental affairs, was attended by the five Democrat members of the Board, including the Freeholder Director, two representatives of Speitel Associates, and the county planner. No Republicans were invited. The December 11 meeting was held at the Gloucester County Courthouse Complex and was attended by the Freeholder Director, the two Republican freeholders, one Republican freeholder-elect, the Speitel representatives, and the county planner.
*374 The testimony is quite clear that the proposed landfill site was the sole item of discussion among the members of the Board in the company of their publically paid consultants and counsel at these two meetings. Prior to these meetings, Speitel Associates had made no siting recommendation to the SWAC and indeed had never met with that body. Two days after the December 10 meeting, Speitel's report publically recommended the subject South Harrison Township[2] site on the Swedesboro-Monroeville Road to the SWAC. This apparently was the main site discussed at the December 10 meeting of the all-Democratic effective majority of the Board. Two other sites in South Harrison Township and one in adjoining Woolwich Township were also discussed briefly at the December 10 and 11 meetings. At the December 12 meeting the SWAC quickly approved the subject South Harrison site and recommended it to the Board. That very night, the Board voted to adopt the SWAC recommendation at its own December 12 meeting and immediately scheduled a public hearing on the proposed plan for December 27, 1984.
Notice of the December 27 public hearing was published on December 14 and 16. At the public meeting on Thursday, December 27 attended by about 800 people, many comments from the public were heard. The December 27 meeting started at 7 p.m. and continued until 6:30 a.m. on December 28. The Board then moved to recess or adjourn the meeting, which was resumed at 6:30 p.m. on December 28 without any further formal published notice. Upon resumption with about 300 in attendance, the Board members discussed the proposed plan amendment and after about an hour and one-half voted 6-1 to approve the South Harrison site.
At the closed December 10 and 11 meetings held without notice to the public, all agreed that siting of the landfill in *375 South Harrison was discussed thoroughly. Apparently, a site in Woolwich Township was only tangentially or slightly discussed. No one but the participants knew about these December 10 and 11 meetings until well after the public hearing was held and the vote taken on December 27 and 28. The public was told specifically at the public hearing that the Board had "no knowledge of what site was going to be selected until, in fact, we were advised by Speitel Associates specifically the site selected the evening [December 12] of the public [SWAC] presentation." The Board had met in the same building as the SWAC on the evening of December 12. As noted, the SWAC recommendation of the South Harrison subject site was immediately brought to the Board's attention and it promptly scheduled the December 27 public meeting.
We conclude that the December 10 and 11 meetings violated the Open Public Meetings Act and that these violations were not cured by the public meeting of December 27 and 28 because the public did not know of the prior meetings at that time. The trial judge found that the meetings of December 10 and 11 were "informational" only, briefing sessions, and not public meetings within the meaning of the "Sunshine Law". He relied to some extent on the attendees belief that they were not in fact public meetings. We reject such a subjective test.
Important public business was discussed at these two meetings. Paid consultants were available to inform the elected representatives of their views. The record strongly suggests that only one municipality and one site in that municipality were seriously considered for the landfill site. We find no difficulty on this record in concluding that a strategy was mapped at these meetings, particularly the December 10 meeting attended by the effective majority of the Board. Secrecy about the discussions of December 10 and 11 and the probable site was advised by the leadership until a public announcement was made. Even though the purpose of a meeting is to discuss and not to vote on public business, the Open Public Meetings *376 Act is applicable. See Allan-Deane Corp. v. Tp. of Bedminster et al., 153 N.J. Super. 114, 119 (App.Div.), certif. den. 74 N.J. 272 (1977). The declaration of legislative policy is clear.
The Legislature finds and declares that the right of the public to be present at all meetings of public bodies, and to witness in full detail all phases of the deliberation, policy formulation, and decision making of public bodies, is vital to the enhancement and proper functioning of the democratic process; that secrecy in public affairs undermines the faith of the public in government and the public's effectiveness in fulfilling its role in a democratic society, and hereby declares it to be the public policy of this State to insure the right of its citizens to have adequate advance notice of and the right to attend all meetings of public bodies at which any business affecting the public is discussed or acted upon in any way except only in those circumstances where otherwise the public interest would be clearly endangered or the personal privacy or guaranteed rights of individuals would be clearly in danger of unwarranted invasion. [N.J.S.A. 10:4-7; emphasis supplied].
Nor can these meetings by any stretch of imagination be called "typical partisan caucus meetings" or "chance encounters" exempted from the Act. Ibid. The statutory definition of meeting does not cover any gathering attended "by less than an effective majority." N.J.S.A. 10:4-8(b). By clear inference, the December 10 meeting attended by five members, a majority of the Board, "with the intent to discuss ... the specific public business" of the Board certainly falls squarely within the scope of the proclaimed legislative policy that important public discussions are to be held in the open. Indeed, failure "to invite a portion of its members to a meeting for the purpose of circumventing" the Act is specifically prohibited. N.J.S.A. 10:4-11; cf. Witt v. Gloucester Cty. Bd. of Freeholders, 94 N.J. 422, 431-432 (1983) (no proof of private meeting of Republican majority of Board). The nine classes of exceptions to the act contained in N.J.S.A. 10:4-12 are most specific. None come close to applying here to these discussions concerning the siting of the sole landfill in the county, a landfill which could be operational for some years and whose environmental impact is permanent and could perhaps affect unborn generations.
Moreover, we have been told by the Legislature that the Act "shall be liberally construed in order to accomplish its purpose and public policy of this State" as described above. N.J.S.A. *377 10:4-21. The purpose of the "Sunshine Law" was "to promote public confidence in the public bodies which govern them" and the Legislature wanted to "accomplish this by making public bodies operate in an open, public atmosphere." Accardi v. Mayor & Council of North Wildwood, 145 N.J. Super. 532, 541 (Law Div. 1976).[3] Where the public's business is openly conducted, speculation about what happened and why is avoided.
*378 We also conclude that this case is quite different from Woodbury Times v. Gloucester County Sew. Authority, 151 N.J. Super. 160, 167 (Law Div. 1977), aff'd 158 N.J. Super. 448 (App.Div. 1978), where three members of the five-member county sewer authority met with DEP officials and representatives of the Attorney General's office to discuss the terms of an administrative order issued by the DEP concerning meeting minimum standards for removal of sludge from sewage before discharge into the Delaware River. We found that this assemblage of persons was not a public meeting at the time they met to work out this compliance problem with the State regulatory authority. We see no analogy between this kind of work-a-day interagency conference and the process of selection of the county's only landfill site to be used into the foreseeable future.
Finally, even assuming the legality of the continued December 28 meeting held without formal notice, we reject any notion that the December 27 and 28 meeting "cured" the illegal meetings of December 10 and 11 under N.J.S.A. 10:4-15. That section of the Act makes illegal actions voidable by the courts but allows "a public body to take corrective or remedial action by acting de novo at a public meeting held in conformity with this act." We so hold because the Board never made the private meetings or their agendas known to the public before the public meeting and vote on December 27 and 28. Thus, we do not think the Board acted "de novo" at the public meeting within the meaning of the Act. Our Supreme Court counsels that "strict adherence to the letter of the [Sunshine] law is required in considering whether a violation of the Act has occurred." Pollillo v. Deane, 74 N.J. 562, 578 (1977) (Atlantic City Charter Study Commission's acts voided). We find these *379 words of Justice Pashman in the Atlantic City case particularly cogent.
Acceptance of defendants' final contention that we need look only at the notice given before the last two meetings  when the Commission took formal action  would undermine the entire purpose of the Act. This would allow an agency to close its doors when conducting negotiations or hammering out policies, and then to put on an appearance of open government by allowing the public to witness the proceedings at which its action is formally adopted. Such an interpretation of the statute would conflict with N.J.S.A. 10:4-15(a) which provides that "a public body may take corrective or remedial action by acting de novo at a public meeting held in conformity with this act." [Emphasis added.] Surely it cannot be realistically contended that the September 2 and 3 meetings constituted a "de novo" reaffirmation of the activities which had transpired at the previous meetings. Consequently, even assuming the Commission did comply with the Act at these last two meetings, we do not believe that its actions were sufficient to correct the past violations which the trial judge found. [Id. at 578].
As in that case, the remedy is for the Board "to embark again upon its task of considering an appropriate" landfill site. Id. at 580. "[A]ny decision in that regard must be arrived at in a manner in strict conformity with the Open Public Meetings Law ..." including adequate notice and a publicized agenda. Ibid.
The action of the Board in selecting the South Harrison Township site was void. N.J.S.A. 10:4-15(b).
Reversed.
NOTES
[1] A-3160-84T5; A-766-85T5; A-3047-84T5 and A-2143-85T4.
[2] There are 108,540 registered voters in Gloucester County; 868 live in South Harrison Township.
[3] The historic reasons for open government were discussed by Justice Pashman in Polillo v. Deane, 74 N.J. 562, 570-572 (1977).

The policy reasons for opening up government to the public have been expressed on numerous occasions throughout this nation's history. Foremost among them is the goal of fulfilling our cherished ideal of creating a "government of the people." James Madison wrote:
A popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives. [Letter to W.T. Barry, Aug. 4, 1822, in 9 Writings of James Madison, 103 (G. Hunt ed. 1910)].
DeTocqueville felt that these same ideas were fundamental to the American tradition. In his perceptive commentaries about our system of government, he observed:
It is by taking a share in legislation that the American learns to know the law; it is by governing that he becomes educated about the formalities of government. The great work of society is daily performed before his eyes, and so to say, under his hands. [A. DeTocqueville, Democracy in America 304 Doubleday & Co., Inc. (1948 ed.)].
A second reason for conducting government in the "sunshine" is that it prevents corruption. Few persons would disagree with Woodrow Wilson's statement that "corruption thrives in secret places, and avoids public places." F. Rourke, Secrecy and Publicity 25 (1961) (quoting Wilson in The New Freedom 92-104). See Markham, "Sunshine on the Administrative Process: Wherein Lies the Shade," 28 Admin.L.Rev. 463 (1976); Tacha, "The Kansas Open Meeting Act: Sunshine on the Sunflower State?" 52 Kan.L.Rev. 169 (1977). Former Chief Justice Warren viewed the Watergate scandal as an unfortunate confirmation of the truth of Woodrow Wilson's observation. He stated:
It would be difficult to name a more efficient ally of corruption than secrecy. Corruption is never flaunted to the world. In government it is invariably practiced through secrecy  secrecy found in every level of government from city halls to the White House and Capitol. If anything is to be learned from our present difficulties, compendiously known as Watergate, it is that we must open our public affairs to public scrutiny on every level of government. [Warren, Governmental Secrecy: Corruption's Ally, 60 A.B.A.J. 550 (1974)].
Surely these principles are more than mere abstract expressions of some illusory ideal.