939 A.2d 230 (2008)
398 N.J. Super. 7
In the Matter of Consider DISTRIBUTION OF the CASINO SIMULCASTING SPECIAL FUND (ACCUMULATED IN 2005) In the Amount of $1,820,699.42 Pursuant to N.J.S.A. 5:12-205d.
Superior Court of New Jersey, Appellate Division.
Argued October 16, 2007.
Decided January 22, 2008.
*232 Michael D. Schottland, Freehold, argued the cause for appellant New Jersey Thoroughbred Horsemen's Association (Lomurro, Davison, Eastman & Munoz, attorneys; Mr. Schottland, of counsel; Peter V. Koenig, on the brief).
Kimmo Z. Hussain, Morristown, argued the cause for respondents Freehold Raceway, Pennwood Racing, Inc., FR Park, LP, Atlantic City Racing Association and Greenwood ACRA, Inc. (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; John M. Pellecchia, of counsel and on the brief; Mr. Hussain, on the brief).
Julie D. Barnes, Deputy Attorney General, argued the cause for respondent New Jersey Racing Commission (Anne Milgram, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Ms. Barnes, on the brief).
Respondent New Jersey Sports and Exposition Authority did not file a brief.
Respondent Standardbred Breeders & Owners Association of New Jersey did not file a brief.
Respondent Thoroughbred Breeders' Association of New Jersey did not file a brief.
Before Judges FUENTES, GRALL and CHAMBERS.
The opinion of the court was delivered by
GRALL, J.A.D.
The New Jersey Thoroughbred Horsemen's Association (THA) appeals from a final order of the New Jersey Racing Commission (NJRC) distributing, pursuant to N.J.S.A. 5:12-205d, $1,820,669.42 that was deposited in the Casino Simulcasting Special Fund (Special Fund) during the year 2005. THA challenges the procedures the NJRC employed in distributing the fund among the competing applicants,[1] alleging violations of the "Senator Byron M. Baer Open Public Meetings Act" (OPMA), N.J.S.A. 10:4-6 to -21, the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -25, and due process. We conclude that the NJRC's action was inconsistent with the OPMA, the APA and the principles of administrative due process.
*233 The Special Fund at issue was established by the Casino Simulcasting Act (CSA), N.J.S.A. 5:12-191 to -210. The CSA authorizes casinos in Atlantic City to accept wagers on and receive live transmissions of horse races conducted in this State and other jurisdictions. See N.J.S.A. 5:12-191 to -193. The CSA directs the NJRC to deposit into the Special Fund a specified portion of wagers made at casinos on races sent from racetracks "out-of-State." See N.J.S.A. 5:12-203g (3); N.J.S.A. 5:12-205. The NJRC is responsible for administering the Special Fund and must disburse the entire amount annually. N.J.S.A. 5:12-205. Certain disbursements, which are mandated by subsections a through c of N.J.S.A. 5:12-205, are not at issue here. This dispute centers on the surplus remaining after those mandatory disbursements, which the NJRC must distribute to racetracks and horsemen's organizations in accordance with subsection d of N.J.S.A. 5:12-205. In 2005, a surplus of $1,820,669.42 was available for distribution pursuant to subsection d.
Subsection d provides for distribution of the surplus as follows:
From any amounts remaining after the payments required by subsections a., b. and c. of this section are made, the New Jersey Racing Commission shall compensate, in such amounts as that commission deems appropriate, the following entities in the following order of priority:
(1) any racetrack in this State which can demonstrate to the satisfaction of that commission that its financial well-being has been negatively affected by casino simulcasting;
(2) any racetrack in this State which that commission finds to be financially distressed;
(3) any horsemen's organization which will use the money to fund a project which that commission determines will be beneficial to the racing industry; and
(4) all racetracks located in this State on an equal basis.
[N.J.S.A. 5:12-205d.]
It is clear that subsection d allows racetracks and horsemen's organizations to compete for shares of the surplus in the Special Fund. Although the NJRC has broad discretion to set the amount of the awards, it must select the recipients in accordance with the statutory criteria. The NJRC cannot give a racetrack priority over a horsemen's organization unless the racetrack demonstrates that simulcasting has had a negative effect on its financial well-being or that it is "financially distressed." N.J.S.A. 5:12-205d(1)-(2). A horsemen's organization cannot obtain a share of the fund unless it proposes a project that the NJRC concludes "will be beneficial to the racing industry." N.J.S.A. 5:12-205d(3). If the fund is not exhausted by awards to racetracks or organizations that meet the statutory criteria, the NJRC must divide the remaining surplus equally among the racetracks in this State. N.J.S.A. 5:12-205d(4).
Distribution of the 2005 Special Fund was an item on the agenda for a public meeting of the NJRC. Prior to that meeting, the NJRC received written requests for shares of the 2005 surplus from four racetracks and three horsemen's organizations. It is not clear how these applications were solicited. Neither the record provided on appeal nor the documents listed in the "statement of items comprising the record" includes any communication from the NJRC to racetracks and horsemen's organizations describing the information interested applicants should submit. See R. 2:5-4(b). The NJRC has not adopted a rule "of practice" explaining the application process. N.J.S.A. 52:14B-3(2).
*234 The New Jersey Sports and Exposition Authority (NJSEA) requested $980,800, representing $490,400 for each of the tracks the NJSEA operates at the Meadowlands and Monmouth Park. Relying upon subsection d(1) and the NJRC's prior recognition of the negative impact of simulcasting on all New Jersey racetracks, the NJSEA requested money to defray the costs of major capital improvement programs.
Freehold Raceway requested $550,000. Relying upon a decline in "live business" from seventy-five million in 1993 at the "inception of casino simulcasting" to twenty-seven million in 2005, Freehold Raceway alleged "financial distress due to an increasing need to reinvest monies into the facility in order to keep it competitive with other gaming in the State." Freehold sought the funds to "increase [its] ability to provide a quality product to [its] customers and horse owners."
The Atlantic City Race Course, without reference to a statutory standard, requested $250,000 for specific projects needed to upgrade, improve and repair its facility.
The Thoroughbred Breeders' Association requested $475,000 to help fund its current awards program. Noting a decline in the number of thoroughbred horses and horse farms in this State and its need for five million dollars to fund a competitive awards program, this horsemen's organization sought an amount adequate to fund the program at its current level.
The Standardbred Breeders & Owners Association requested $300,000. This horsemen's organization planned to use the money to "help fund the Health Benefit Trust that provides for health, prescription and dental benefits to approximately 1200 individuals working on the backstretch."
THA's submission, set forth in full, follows:
Please consider this as a written submission setting forth the amount of funds the NJTHA, Inc. seeks and the purpose for said request.
We hereby request the amount of $364,139.88 (1/5 of the total fund) to cushion the direct benefit costs and welfare payments of this organization for the current year 2006 and to set up a reserve for the future for catastrophes.
Thank you for your time and consideration in this matter.
THA's attorney received copies of the requests submitted by the other applicants prior to the public meeting. He also wrote to the Executive Director of the NJRC and inquired about the process the NJRC would employ to resolve the matter. The Executive Director told him "that any discussion, with respect to an item on the agenda, is at the discretion of the [NJRC]."[2]
When the NJRC commenced the public meeting on distribution, the Chairman immediately announced that a member of the commission would make a motion. The motion, which was in written form, was not read. The commissioner simply stated the amount of each of the seven shares he proposed and noted that the reasons were stated in the written form of the motion, which would be "made available to the public at a later date."
*235 THA's attorney asked the Chairman whether THA could have a hearing. The Chairman advised that the attorney would be permitted to speak "[a]fter the vote [was] taken."
Without further discussion or explanation, the NJRC voted to distribute the surplus from the Special Fund as proposed in the motion: $455,167.35 each to the Meadowlands, Monmouth Park and Freehold tracks; $75,000 to the Atlantic City track; $190,083.68 for the standardbred organization; and, one-half that amount, $95,041.84, to each of the two thoroughbred organizations.
After the vote, THA's attorney contended that the vote violated the OPMA. He also argued that because the combined requests submitted by the competing applicants exceeded the amount available for distribution, the matter was contested and a hearing was required by the APA.
The Chairman rejected the arguments. The Chairman explained that the NJRC used the procedures it employed in prior years and everyone involved was "`aware of' the ground rules." He described that process: "[E]veryone submitted their written information that was requested[,] and we reviewed it[,] and we discussed it[,] and we acted upon it[,] and we made a distribution." Expressing his willingness to entertain proposals for a better procedure in future years, the Chairman deemed it inappropriate for THA to suggest a different procedure on the day the NJRC was "supposed to make the distribution." Noting that the NJRC had voted, the Chairman concluded the meeting. This appeal followed.
The CSA provides no guidance on procedures the NJRC should employ in gathering relevant information or selecting recipients from the group of applicants for funds distributed pursuant to N.J.S.A. 5:12-205d. The CSA simply requires NJRC to "promulgate and adopt any rules . . . necessary to effectuate the purposes of [the CSA]," pursuant to the APA. N.J.S.A. 5:12-210.
Legislative deference to an administrative agency's selection of appropriate procedures is not unusual. Generally, "[a]dministrative agencies have wide discretion in selecting the means to fulfill the duties that the Legislature delegated to them." Texter v. Dep't of Human Servs., 88 N.J. 376, 383, 443 A.2d 178 (1982). Agencies may "act informally, or formally through rulemaking or adjudication in administrative hearings." Id. at 384, 443 A.2d 178 (citations omitted); see N.J.S.A. 52:14B-3(2) (recognizing the propriety of "informal" action by requiring each agency to "adopt rules of practice setting forth the nature and requirements of all formal and informal procedures available." (emphasis added)). An agency's ability to select procedures it deems appropriate is limited by "the strictures of due process and of the [APA]. . . ." In re Request for Solid Waste Utility Customer Lists, 106 N.J. 508, 519, 524 A.2d 386 (1987). If the agency complies with those strictures, courts generally "defer to the procedure chosen by the agency in discharging its statutory duty." Ibid. Where, as here, the administrative agency is a "commission . . . organized under the laws of this State, and . . . collectively authorized to spend public funds," and is acting by means other than formal rulemaking or adjudication pursuant to the APA, it must comply with the OPMA. N.J.S.A. 10:4-8a.
THA contends that the NJRC's public vote, which was based on private discussions and deliberations, violates the OPMA. We agree. As the Chairman described the process, the applicants submitted information, the members of the NJRC "reviewed it[,] and [they] discussed *236 it[,] and [they] acted upon it[,] and [they] made a distribution." (emphasis added). Only the voting was done in public.
The OPMA requires a different course of action. In adopting the OPMA, the Legislature recognized "that secrecy in public affairs undermines the faith of the public in government." N.J.S.A. 10:4-7. And, the Legislature declared that the "the right of the public . . . to witness in full detail all phases of the deliberation, policy formulation, and decision making of public bodies[] is vital to the . . . proper functioning of the democratic process. . . ." N.J.S.A. 10:4-7; see generally Polillo v. Deane, 74 N.J. 562, 571, 379 A.2d 211 (1977) (discussing the importance of information to our form of government and the relationship between secrecy and public corruption). Accordingly, the OPMA requires the members of a public body to deliberate and vote at a public meeting held after giving adequate notice to the public. N.J.S.A. 10:4-8; N.J.S.A. 10:4-9; N.J.S.A. 10:4-12a; see S. Jersey Pub. Co., Inc. v. New Jersey Expressway Auth., 124 N.J. 478, 490, 591 A.2d 921 (1991) (noting that the OPMA provides greater access than prior law, which required disclosure of the official vote but not discussions leading to the vote). While the OPMA recognizes circumstances that authorize private deliberations to protect the public interest or personal rights, none of those circumstances were present here. N.J.S.A. 10:4-12b; see N.J.S.A. 10:4-7.
In this case, the NJRC disbursed nearly two million dollars without any public discussion or deliberation. The fact that the members of the NJRC voted at a public meeting and ultimately explained the result does not cure the problem of private deliberations. The Supreme Court has so held. Polillo, supra, 74 N.J. at 578, 379 A.2d 211. The Court reasoned that such an approach, contrary to the purpose of the OPMA, "would allow an agency to close its doors when conducting negotiations or hammering out policies, and then to put on an appearance of open government by allowing the public to witness the proceedings at which its action is formally adopted." Ibid. (noting also that an interpretation permitting cure by a final public vote "would conflict with N.J.S.A. 10:4-15(a) which provides that `a public body may take corrective or remedial action by acting de novo at a public meeting held in conformity with this act.'"). By the Chairman's admission, the NJRC made its decision based on a discussion that did not take place at the public meeting. See S. Harrison, Twp. Comm. v. Bd. of Chosen Freeholders, 210 N.J.Super. 370, 378-79, 510 A.2d 42 (App.Div.) (rejecting a claim that a final public vote could be considered de novo action at a public meeting curing past violations), certif. denied, 105 N.J. 566, 523 A.2d 198 (1986).
The NJRC did not comply with the OPMA. For that reason, we void the action and remand to permit the NJRC to act de novo. See N.J.S.A. 10:4-15a.
THA also contends that the NJRC failed to comply with the APA because it did not adopt a regulation describing the procedures governing submission and consideration of applications. Again, we agree. Indeed, based on the colloquy at the public meeting, we question whether the NJRC even considered the procedural questions in light of the APA and principles of administrative due process. While courts defer to procedures chosen by an administrative agency, we cannot defer unless it is clear that the agency made a selection and complied with the APA and principles of administrative due process. Solid Waste, supra, 106 N.J. at 519, 524 A.2d 386.
Pursuant to the APA, each agency must "adopt rules of practice setting forth the *237 nature and requirements of all formal and informal procedures available, including a description of all forms and instructions used by the agency, and . . . a table of all . . . deadlines, processing times and appeals procedures[.]" N.J.S.A. 52:14B-3(2). The NJRC has not adopted a rule that describes the procedures for awarding shares of the Special Fund.[3] Rules describing agency procedures are important, because such rules "provide notice of the agency's procedures to interested parties and assure that proceedings before the agency are conducted uniformly and fairly." New Jersey Racing Com'n v. Silverman, 303 N.J.Super. 293, 305, 696 A.2d 771 (App.Div.1997). A description of the manner in which proceedings to resolve disputed matters will be conducted is a "fundamental aspect[] of any procedural rules." Ibid.
The record permits an inference that these applicants understood the need to file a written request and had the ability to obtain the requests submitted by other applicants. But the record also demonstrates that there was no common understanding about whether or how one applicant could challenge, object to or present argument relevant to information provided by another applicant. Had the NJRC followed its obligation under N.J.S.A. 5:12-210 to adopt rules and regulations necessary to effectuate the purposes of the CSA and its obligation to promulgate "rules of practice" required by N.J.S.A. 52:14B-3(2), the applicants would have notice of their obligations and opportunities as competitors.[4]
Because the NJRC has not adopted a rule of practice incorporating procedures, the NJRC must comply with N.J.S.A. 52:14B-3(2) before it takes further action.
In exercising its discretion to select appropriate procedures for discharge of its statutory obligations, an administrative agency must consider the nature of the action it is required to take. Subsection d gives the NJRC broad discretion to exercise its expertise in distributing the surplus in the Special Fund in accordance with its assessment of the impact of casino simulcasting on the racetracks, the financial condition of the racetracks and projects that will be "beneficial to the racing industry." N.J.S.A. 5:12-205d(1)-(3). Subsection d, however, also requires the NJRC to distribute this finite portion of the Special Fund among competing applicants who each must establish their eligibility under standards established by the Legislature. N.J.S.A. 5:12-205d.
The questions the NJRC must address in making the annual distribution, unlike the decision to select appropriate procedures for making the decision, do not require rulemaking in accordance with the APA. See N.J.S.A. 52:14B-2(e). Rulemaking is appropriate for decisions that have a "continuing effect." Ibid.; Metromedia, Inc. v. Dir., Div. of Taxation, *238 97 N.J. 313, 328-29, 478 A.2d 742 (1984). As subsection d makes clear, the NJRC must make this decision annually in light of the amount available and the quality of the applications received.[5]
The competition between applicants authorized by N.J.S.A. 5:12-205d is not a "contested case" requiring a trial-like hearing pursuant to the APA. A proceeding qualifies as a "contested case" only if there is a "constitutional" or statutory right to an agency hearing. N.J.S.A. 52:14B-2(b); In re Freshwater Wetlands Statewide Gen. Permits, 185 N.J. 452, 463-64, 888 A.2d 441 (2006) (noting a need for one who has no statutory right to a trial-like hearing in the Office of Administrative Law to demonstrate an interest sufficient to require a hearing on constitutional grounds). Although the racetracks and horsemen's organizations that meet the statutory standard for an award compete with each other for shares of this limited fund, we have held that one's position as a potential competitor is not a constitutionally protected "property right" sufficient to require a trial-type hearing. See In re Valley Hosp., 240 N.J.Super. 301, 312, 573 A.2d 203 (App.Div.1990) (discussing the rights of an objector to an award of a certificate of need), certif. denied, 126 N.J. 318, 598 A.2d 879 (1991); see also Elizabeth Fed. Sav. & Loan Ass'n v. Howell, 24 N.J. 488, 505, 132 A.2d 779 (1957) (discussing the rights of competing bank institutions objecting to an application for merger).
Nonetheless, where, as here, an administrative agency must make a decision that is not subject to the requirements for rulemaking or contested cases imposed by the APA, principles of "administrative due process" apply to protect against arbitrary action. George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 19, 644 A.2d 76 (1994); In re Dep't. of Ins.'s Order Nos. A89-119 & A90-125, 129 N.J. 365, 382, 609 A.2d 1236 (1992). In such cases, the agency must select an informal or hybrid procedure that satisfies the fundamental requirements of procedural due process and administrative fairness by providing "adequate notice, a chance to know opposing evidence, and to present evidence and argument in response." High Horizons Dev. Co. v. Dep't of Transp., 120 N.J. 40, 53, 575 A.2d 1360 (1990); see George Harms Constr., supra, 137 N.J. at 19-20, 644 A.2d 76 (same); In re Dep't. of Ins.'s Order, supra, 129 N.J. at 382, 609 A.2d 1236 (same); Solid Waste, supra, 106 N.J. at 519, 524 A.2d 386 (discussing informal, formal and hybrid means of agency actions); Cunningham v. Dep't of Civil Serv., 69 N.J. 13, 22, 350 A.2d 58 (1975) (discussing propriety of informal proceedings where the question is one of policy based on general facts).
Reversed and remanded for further proceedings.
NOTES
[1] None of the other recipients challenge the agency's final order. The NJRC and the Freehold and Atlantic City tracks filed briefs in opposition to THA's appeal.
[2] The description of all correspondence referenced above is based upon a colloquy at the public meeting. The correspondence was not included in the "statement of items comprising the record on appeal." R. 2:5-4(b). The correspondence clearly ought to have been "on file" in the agency, and it is unquestionably relevant to the procedural issues raised before the agency and presented on this appeal. R. 2:5-4(a).
[3] The brief submitted on NJRC's behalf does not address THA's claim that the NJRC has failed to promulgate a relevant rule of procedure required by the APA.
[4] The requests submitted by THA and other applicants provide little information relevant to the standard the applicants must meet to qualify for an award of a share of this fund, which should be distributed equally among "all racetracks located in this State" if no applicant establishes its eligibility. N.J.S.A. 5:12-205d(1)-(4). Clearly, THA's request, which is for an arbitrary fractional share of the available fund, is inconsistent with the statutory standard. A procedural rule detailing information applicants must submit likely would result in submission of applications more useful to the NJRC in the discharge of its obligation to distribute this fund as the Legislature intends. See N.J.S.A. 52:14B-4 (rulemaking).
[5] On appeal, the respondents rely nearly exclusively on this court's affirmance of a prior distribution of the Special Fund in an unpublished opinion that does not address the procedural arguments presented in this case. In the Matter of Consider Distribution of Casino Simulcasting Special Fund (Accumulated in 2003) Pursuant to N.J.S.A. 5:12-205(d), No. A-6569-03, 2006 WL 1479080 (App.Div. May 31, 2006). That argument was not helpful to the court.