**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1153-14T1

IN THE MATTER OF THE BOARD'S
REVIEW OF THE APPLICABILITY
AND CALCULATION OF A
CONSOLIDATED TAX ADJUSTMENT.

_____

Argued October 25, 2016 — Decided  September 18, 2017

Before Judges Fisher, Ostrer and Vernoia.

On appeal from the New Jersey Board of Public
Utilities, Docket No. EO12121072.

Diane Schulze argued the cause for appellant
Division of Rate Counsel (Stefanie A. Brand,
Director, attorney; Ms. Schulze and Christine
M. Juarez, on the briefs).

Carolyn A. McIntosh, Deputy Attorney General,
argued the cause for respondent New Jersey
Board of Public Utilities (Christopher S.
Porrino, Attorney General, attorney; Andrea M.
Silkowitz, Assistant Attorney General, of
counsel; Ms. McIntosh, on the brief).

Stephen B. Genzer argued the cause for
respondent Aqua New Jersey, Inc., and United
Water New Jersey, Inc. (Saul Ewing LLP,
attorneys; Mr. Genzer, on the brief).

Lawrence S. Lustberg argued the cause for
respondent Atlantic City Electric Company
(Gibbons PC, attorneys; Mr. Lustberg and
Amanda B. Protess, on the briefs).

Gregory Eisenstark argued the cause for respondent Jersey Central Power & Light Company (Windels Marx Lane & Mittendorf, LLP, attorneys; Mr. Eisenstark, on the brief).

Ira Megdal argued the cause for respondent New Jersey-American Water Company, Inc. (Cozen O'Connor, PC, attorneys; Mr. Megdal and Mark Lazaroff, on the brief).

James C. Meyer argued the cause for respondent New Jersey Utilities Association (Riker Danzig Scherer Hyland & Perretti, LLP, attorneys; Mr. Meyer, of counsel and on the brief; Diane N. Hickey, on the brief).

Fox Rothschild LLP, attorneys for respondent New Jersey Large Energy Users Coalition (Steven S. Goldenberg, of counsel and on the brief).

Cullen and Dykman LLP, attorneys for respondent Pivotal Utility Holdings, Inc., (Kenneth T. Maloney, on the brief).

Janine G. Bauer argued the cause for amicus curiae AARP (Szaferman, Lakind, Blumstein & Blader, PC, attorneys; Ms. Bauer, on the brief).

PER CURIAM

The Director of the Division of Rate Counsel appeals the Board of Public Utilities' final order revising its policy for calculating the consolidated tax saving adjustment (CTA) the Board utilizes in part to determine just and reasonable utility rates.

Rate Counsel and other interested parties[1] argue the revised CTA is not supported by adequate findings of fact, is not founded on sufficient evidence in the record, and constitutes a rule that was not enacted in accordance with the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -15, and due process requirements. The Board, and respondents, the New Jersey Utilities Authority and various utility companies[2] contend the Board's adoption of the revised CTA did not constitute rulemaking requiring compliance with the APA, is supported by the evidentiary record, and constitutes a proper exercise of the Board's discretion. Because we conclude the Board's adoption of the CTA constitutes rulemaking and the Board failed to comply with the APA's requirements, we reverse.

I.

The Board is charged with supervising and regulating public utility companies, N.J.S.A. 48:2-13(a), and setting "just and reasonable" rates for those utilities, N.J.S.A. 48:2-21(b)(1).

---

[1] Respondent New Jersey Large Energy Users Coalition and amicus American Association of Retired People (AARP) filed briefs supporting Rate Counsel's appeal. The Coalition participated in the proceeding before the Board. We granted AARP leave to participate in the appeal as amicus curiae.

[2] The respondent utility companies are Aqua New Jersey Inc., United Water New Jersey Inc., Atlantic City Electric Company, Jersey Central Power & Light Company, American Water Company, Inc., and Pivotal Utility Holdings, Inc.

The Division of Rate Counsel is a quasi-independent agency authorized by statute to represent the interests of utility ratepayers in rate-setting matters before the Board. N.J.S.A. 52:27EE-48(a); I/M/O Provision of Basic Generation Serv., 205 N.J. 339, 360 (2011).

To obtain an increase in utility rates, a utility company must petition the Board and prove that an increase is just and reasonable. N.J.S.A. 48:2-21(d). To sustain its burden of proof, a utility must establish "(1) the value of its property or the rate base, (2) the amount of its expenses, including operations, income taxes, and depreciation, and (3) a fair rate of return to investors." In re N.J. Am. Water Co., 169 N.J. 181, 188 (2001).

A company's "rate base" is "the fair value of the property of the public utility that is used and useful in [providing the regulated] public service." In re Petition of Pub. Serv. Coordinated Transport, 5 N.J. 196, 217 (1950). Reasonable rates for the service are generally set at an amount meant to "cover the utilities' expenses plus a return on the shareholders' investment," that is, an amount that permits "the public utility to earn a fair return on its rate base." Penpac, Inc. v. Passaic Cty. Utils. Auth., 367 N.J. Super. 487, 506 (App. Div.), certif. denied, 180 N.J. 457 (2004).

In an assessment of a utility's claimed expenses, a reasonable

rate shall be based only on "actual operating expenses . . . , and not for hypothetical expenses which did not and foreseeably will not occur." In re N.J. Power & Light Co., 9 N.J. 498, 528 (1952). The calculation of a utility company's tax expenses for use in the determination of its rate base is controlled "only by [its] real tax" expense, "rather than that which is purely hypothetical." Lambertville Water Co. v. N.J. Bd. of Public Util. Comm'rs, 153 N.J. Super. 24, 28 (App. Div. 1977), rev'd in part on other grounds, 79 N.J. 449, 458 (1979).

The Board has used a CTA to calculate the real tax expenses of utility companies whose federal tax returns are filed as part of the consolidated tax returns of their parent companies. The filing of a consolidated tax return permits the parent to offset the tax liability resulting from the profits of one or more of its affiliates against the losses of other affiliates. This reduces the tax obligations of each member of the group and saves each member a portion of the tax obligation they would have incurred if they filed their returns separately. Our Supreme Court has made clear that ratepayers must share in the resulting benefit to the utility. N.J. Power & Light Co., supra, 9 N.J. at 528. Otherwise, ratepayers would pay a utility's hypothetical and not real tax expenses. Ibid.

The Board has "the power and function to take into

consideration the tax savings flowing from the filing of [a] consolidated return and determin[e] what proportion of the consolidated tax is reasonably attributable to" the utility. Lambertville Water Co., supra, 153 N.J. Super. at 28. The Board is not bound by any particular methodology and may exercise its sound discretion to determine and make appropriate adjustments for a company's actual tax liability and thus ensure the reasonableness of the resultant rates. In re Revision of Rates Filed by Toms River Water Co., 158 N.J. Super. 57, 60-61 (App. Div. 1978), rev'd on other grounds, 82 N.J. 201 (1980). The Board has exercised its authority by using the CTA as the means to share with the company's ratepayers the benefits of the tax savings resulting from the consolidated tax filings.

The CTA Methodology

Prior to the Board's order challenged on appeal, the Board used what has been characterized as "the Rockland methodology"[3] to determine the CTA. Under the Rockland methodology, calculation of the CTA first requires a determination of the net taxable gains

_____

[3] The Rockland methodology was developed in a series of rate cases culminating in I/M/O The Verified Petition Of Rockland Electric Company, BPU Docket No. ER02100724 (Apr. 20, 2004) (slip op. at 62-64); see also In re Petition of Jersey Cent. Power & Light Co., BRC Docket No. ER91121820J (June 15, 1993) (slip op. at 8); In re Petition of Atlantic City Elec. Co., BRC Docket No. ER90091090J (Oct. 20, 1992) (slip op. at 6).

and losses of all of the companies on the consolidated federal tax return for each year during a review period which begins in 1991 and ends in the most recent tax year. The companies that experienced net taxable gains are grouped together and their net taxable gains are aggregated. The companies that experienced net taxable losses are grouped together and their net taxable losses are aggregated. The aggregated losses are then multiplied by the applicable federal income tax rate to determine the group's consolidated tax benefit. The amount of the consolidated tax benefit is then allocated proportionately to the companies that experienced net taxable gains based on their proportionate share of the total aggregated gains.

If application of the Rockland methodology establishes that a New Jersey utility experienced net taxable gains during the review period, its proportionate share of the consolidated tax benefit constitutes its CTA. The amount of the CTA affects the utility's rate base because the larger the tax savings adjustment under the CTA, the greater the reduction in the utility's rate base.[4]

---

[4] The CTA does not result in a dollar-for-dollar reduction in the utility's tax expenses that are used to calculate the rate base. The CTA tax savings are treated as a loan from ratepayers, whose payments contributed to the profits that would otherwise have been taxed if not for the consolidated filing. Jersey Cent. Power &

The Board Modifies the Rockland Methodology

In January 2013, the Board approved an order opening a generic proceeding to review the CTA. The Board noted that its current CTA methodology had been used for approximately twenty years and that federal tax laws and many of the companies' corporate structures had changed. The Board sought "input from stakeholders, including the utilities, customers, and . . . Rate Counsel" to determine the Board's use of the CTA, the calculation of tax savings from the filing of consolidated returns, the manner in which the savings should be shared with the utility companies and ratepayers, and if a rulemaking proceeding should be initiated. The order was posted to the Board's website and circulated to those on its generic stakeholder service list.

In March 2013, the Board posted an official Notice of Opportunity to Comment on its website and circulated it to stakeholders on its service list. The notice requested comments concerning the CTA and responses to requests for information about the stakeholders' respective positions on whether a CTA should be

---

Light Co., supra, slip op. at 8. The parent company gains use of those profits earlier than it otherwise would have, and the CTA, in turn, compensates ratepayers for the time-value of their money by adjusting the company's rate base in an amount intended to prospectively credit ratepayers for the carrying costs of the loan. Petition of Atlantic City Elec. Co., supra, slip op. at 6.

utilized and what changes should be made to the CTA. The Board requested that the utility companies calculate their current CTA using the Rockland methodology and include, if applicable, the CTA included in the company's last rate base case. The notice advised that following the Board's review of the responses, it would announce a schedule of hearings to provide all interested parties with the opportunity to provide testimony on CTA issues.

The New Jersey Utilities Authority (NJUA) submitted comments on behalf of its members and various utility companies also submitted written comments. They advocated for the abolition of the CTA, arguing that the adjustment had become arbitrary due to an ever-expanding review period that used 1991 as its fixed starting point, and due to the CTA calculation's inclusion of companies that no longer participated in the consolidated income tax filings. They also asserted that application of the CTA adversely affected the utility companies' ability to attract capital and other investments necessary to ensure the safe and efficient provision of their regulated services.

The utility companies and the NJUA further noted that the relatively small CTAs that resulted from application of the methodology when it was first implemented had been replaced by a CTA that in one case was more than forty times higher. They urged the elimination of the CTA and argued that if the Board continued

A-1153-14T1

its use, the review period should be reduced to as few as three years, electric company transmission assets and other operations should be removed from the analysis because they are not regulated by the Board, and companies that have been divested, dissolved, or are otherwise inactive should be excluded from the calculation.

Rate Counsel also submitted comments acknowledging that the length of the review period could result in inappropriately large adjustments and that changes in the tax code during the twenty years since the adoption of the methodology might impact the propriety of the calculation. Rate Counsel recommended that the CTA be reevaluated and adjusted based on utility specific data in fourteen different areas. Rate Counsel also urged that adoption of a revised CTA be completed through formal rulemaking.

In July 2013, the Board issued a Notice of Opportunity to Provide Additional Information, requesting that the utility companies provide data in each of the fourteen areas suggested by Rate Counsel. The notice further advised that following its review of the requested data, the Board would schedule a hearing to provide interested parties with an opportunity to testify concerning the CTA.

In November 2013, the Board issued a letter request for data concerning the taxable gains and losses for the utility companies and their affiliates for each calendar year from 1991 through

2012, and similar information from electric and gas companies broken down into gains and losses attributable to their separate electric and gas operations.

Based on the information and comments received during the process, at the Board's June 2014 meeting its staff recommended the retention of the Rockland methodology for calculation of the CTA with the following three revisions: (a) reduction of the review period to a fixed span of five calendar years; (b) an allocation of the benefits of consolidated tax savings with the utility company receiving seventy-five percent of the savings and the ratepayers receiving twenty-five percent; and (3) the exclusion of electric company transmission assets from the CTA calculation. The Board published notice of the proposed policy on its website and in the New Jersey Register, 46 N.J.R. 1657(a) (July 7, 2014), and distributed the notice to its service list, advising that public comments would be received until August 18, 2014.

The NJUA, the utility companies, Rate Counsel and the New Jersey Large Energy Users Coalition submitted comments. At its October 2014 meeting, the Board considered the recommended revisions and issued a final decision adopting them. The Board ordered that the CTA Rockland methodology would remain in effect with the following modifications:

> 1. The review period for the calculation shall be for five calendar years including any complete year that is included in the test year.
>
> 2. The [CTA] based on that review period shall be allocated so that the revenue requirement of the company is reduced by 25% of the adjustment; and
>
> 3. Transmission assets of the [electric distribution companies] would not be included in the calculation of the CTA.

The Board further ordered that the modified CTA would be utilized in all pending and future rate cases. The Board permitted the reopening of cases to permit recalculation of the CTA where the record was closed but the Board had not yet rendered a final decision. The Board's decision and order was entered on October 22, 2014. Corrective orders were entered on November 3, 2014 and again on December 17, 2014. Rate Counsel appealed.

## II.

Rate Counsel, the Coalition and amicus AARP assert that the Board's decision and order must be reversed because the Board was obligated to promulgate the CTA modifications through formal rulemaking in accordance with the APA. N.J.S.A. 52:14B-4. They contend the Board's order establishes a uniform policy defining the CTA methodology and, therefore, it establishes a rule that can only be adopted in accordance with the APA. In its decision, the Board found that rulemaking was not required because it had

"flexibility to determine how to proceed in matters presented to it, and [could] use its discretion to choose the most appropriate manner, including by contested case, rulemaking or informal process, based on the issues raised and the potential effects of the resolution." The Board, the NJUA and the utility companies do not dispute that the Board did not comply with the APA's procedures for rulemaking, but they contend rulemaking was not required because the CTA does not establish the rates, and application of the CTA can be adjusted in rate cases to ensure that the Board fulfills its obligation to set fair and reasonable rates. See N.J.S.A. 48:2-21(b)(1).

"Administrative agencies possess wide latitude in selecting the appropriate procedures to effectuate their regulatory duties and statutory goals." In re Auth. For Freshwater Wetlands Statewide Gen. Permit 6, Special Activity Transition Area Waiver For Stormwater Mgmt., Water Quality Certification, 433 N.J. Super. 385, 413 (App. Div. 2013); accord In re Request for Solid Waste Util. Customer Lists, 106 N.J. 508, 519 (1987). "[A]gencies enjoy great leeway when selecting among rulemaking procedures, contested hearings, or hybrid informal methods in order to fulfill their statutory mandates." Provision of Basic Generation Serv., supra, 205 N.J. at 347. However, "[a]n agency's ability to select procedures it deems appropriate is limited by 'the strictures of

due process and of the [APA].'" In re Consider Distrib. of Casino Simulcasting Special Fund, 398 N.J. Super. 7, 16 (App. Div. 2008) (quoting Request for Solid Waste Util. Customer Lists, supra, 106 N.J. at 519).

An agency's "discretion to act formally or informally is not absolute." In re N.J.A.C. 7:1B-1.1 Et Seq., 431 N.J. Super. 100, 133 (App. Div.), certif. denied, 216 N.J. 8 (2013). "If an agency determination or action constitutes an 'administrative rule,' then its validity requires compliance with the specific procedures of the APA that control the promulgation of rules." Auth. For Freshwater Wetlands Statewide Gen. Permit 6, supra, 433 N.J. Super. at 413 (quoting Airwork Serv. Div. v. Div. of Taxation, 97 N.J. 290, 300 (1984), cert. denied, 471 U.S. 1127, 105 S. Ct. 2662, 86 L. Ed. 2d 278 (1985)); accord Provision of Basic Generation Serv., supra, 205 N.J. at 347.

"Agencies should act through rulemaking procedures when the action is intended to have a 'widespread, continuing, and prospective effect,' deals with policy issues, materially changes existing laws, or when the action will benefit from rulemaking's flexible fact-finding procedures." Provision of Basic Generation Serv., supra, 205 N.J. at 349-50 (quoting Metromedia, Inc. v. Div. of Taxation, 97 N.J. 313, 329-31 (1984)). To determine if the APA

rulemaking requirements are implicated, we apply the following analysis:

> [A]n agency determination must be considered an administrative rule . . . if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.
>
> [Metromedia, supra, 97 N.J. at 331-32.]

"The factors need not be given the same weight, and some factors will clearly be more relevant in a given situation than others," Doe v. Poritz, 142 N.J. 1, 97 (1995), and "[n]ot all factors need be present for an agency action to qualify as an administrative rule," Provision of Basic Generation Serv., supra, 205 N.J. at 350. "The pertinent evaluation focuses on the importance and weight of each factor, and is not based on a

quantitative compilation of the number of factors which weigh for or against labeling the agency determination as a rule." Ibid.

Based on our review of the record, we are satisfied that the Board's order satisfies all of the Metromedia factors and thereby constitutes a rule requiring adoption through rulemaking in accordance with the APA. See Auth. For Freshwater Wetlands Statewide Gen. Permit 6, supra, 433 N.J. Super. at 413. With regard to the first Metromedia factor, the modified CTA applies to all of the utility companies whose tax returns are filed as part of the consolidated returns of their respective holding companies. Cf. Deborah Heart & Lung Ctr. v. Howard, 404 N.J. Super. 491, 506 (App. Div.) (finding rulemaking was not required in part because the nine of eighteen cardiac surgery facilities subject to the policy change constituted a "narrow, select group," and not a "large segment of the regulated public"), certif. denied, 199 N.J. 129 (2009). In addition, because the utility company respondents serve a significant portion of the regulated public and the CTA modifications will "impact the general public in its rate-paying capacity, the first Metromedia factor . . . support[s] closer adherence to rulemaking procedures." Provision of Basic Generation Serv., supra, 205 N.J. at 350-51; see also In re Attorney General's "Directive on Exit Polling: Media and Non-Partisan Public Interest Groups," 402 N.J. Super. 118, 134 (App. Div. 2008) (finding first

Metromedia factor supports rulemaking where the agency's order "is intended to affect a large segment of the public"), aff'd in part and modified in part on other grounds, 200 N.J. 283 (2009).

The second Metromedia factor also favors rulemaking because the modified CTA generally and uniformly applies to all regulated utilities whose tax returns are filed as part of consolidated returns. Metromedia, supra, 97 N.J. at 331. Moreover, the Board's order directs that the modified CTA applies prospectively, including in those cases that were not yet decided but where the record remained open at the time the order was entered. Thus, application of the third Metromedia factor supports a finding that the modified CTA constitutes a rule. Ibid.

As set forth in the Board's order, the modified CTA "prescribes a legal standard [and] directive that is not otherwise expressly provided by or clearly and obviously inferable from the [Board's] enabling statutory authorization." Ibid. The Board is required to set "just and reasonable rates," N.J.S.A. 48:2-21, but there is no statutory directive establishing the methodology for calculating a utility's real, as opposed to hypothetical, tax payments to determine its rate base, and no statute directs the use of a CTA. See Airwork, supra, 97 N.J. at 301 (holding rulemaking is not required for an agency order directing the form of a tax assessment where tax statute is specific concerning the

underlying tax obligation). We are therefore satisfied the fourth Metromedia factor favors a finding that rulemaking is required.

Application of the fifth Metromedia factor also favors rulemaking. Although the use of a CTA and the Rockland methodology were previously expressed in the Board's determinations in adjudicated cases, the shortened and finite review period, the allocation of the tax savings, and the elimination of electric transmission assets constitute "material and significant change[s]" to the Board's prior CTA policy. Metromedia, supra, 97 N.J. at 331. The Board never before employed a finite review period or a defined allocation, and never previously excluded a class of a utility company's assets from its CTA calculation. Further, it is not disputed that the modifications constitute material and significant changes to the CTA. Indeed, Rate Counsel, the Coalition, the NJUA and the utility companies argued before the Board that the CTA required material and significant changes, and the Board's order achieved that result.

Last, the modifications reflect the Board's decision on a regulatory policy "in the nature of an interpretation of law or general policy." Id. at 331-32. The Board acknowledges as much in its decision and order, stating that the modifications are required to recognize "the fact that a fundamental tenet of utility regulation is that any methodology used by a regulator must result

18

in an end result that is just and reasonable for both ratepayers and shareholders." The Board adopted the modifications based on its finding that the prior CTA methodology "may not be the appropriate means of achieving that fundamental principle." See Provision of Basic Generation Serv., supra, 205 N.J. at 352 (finding the Board's decision to "pass through" certain costs to ratepayers could be viewed as a regulatory policy which was to be applied later in individual rate-recovery hearings).

In sum, all of the Metromedia factors favor rulemaking here. The Board's order constitutes a "statement of general applicability and continuing effect that implements [and] interprets" the Board's "policy" concerning the calculation of tax adjustments to a utility company's rate base, N.J.S.A. 52:14B-2(e), and therefore is a rule within the meaning of the APA. See, e.g., Auth. For Freshwater Wetlands Statewide Gen. Permit 6, supra, 433 N.J. Super. at 413 (finding agency's adoption of a computer-based program used to determine the sufficiency of proposed nonstructural stormwater management measures constituted rulemaking); N.J. Animal Rights Alliance v. N.J. Dep't of Envt'l. Prot., 396 N.J. Super. 358, 369-70 (App. Div. 2007) (finding agency's policy detailing requirements for a public bear hunt constituted a rule requiring APA rulemaking).

Rate counsel, the Coalition and amicus AARP argue the Board's failure to comply with the APA requires reversal of the Board's order. They contend the Board's failure to engage in formal rulemaking deprived the stakeholders of APA procedural safeguards and an opportunity to present evidence and testimony at an evidentiary hearing.

For example, Rate Counsel argues the Board failed to comply with the following APA requirements: publish a proposal containing "a clear and concise explanation of the purpose and effect of the rule, the specific legal authority under which its adoption is authorized, [and] a description of the expected socio-economic impact of the rule," N.J.S.A. 52:14B-4(a)(2), and prepare and distribute "a report listing all parties offering written or oral submissions concerning the rule, summarizing the content of the submissions and providing the agency's response to the data, views, comments, and arguments contained in the submissions," N.J.S.A. 52:14B-4(a)(4). The record supports Rate Counsel's position. These APA requirements were not satisfied in the generic proceeding.

Rate Counsel also argues, and the record shows, that the Board's March 2013 Notice of Opportunity to Comment and July 2013 Notice of Opportunity to Provide Additional Information each stated that following the collection of the requested data and comments, the Board would "announce a schedule for hearings to

20

provide all interested parties with the opportunity to provide testimony on the CTA issues." The Board, however, never announced such hearings or conducted any hearings providing interested parties with the opportunity to present testimony.

Although agencies enjoy leeway to choose among rulemaking, adjudicatory hearings, and hybrid informal proceedings to fulfill their statutory mandates, Provision of Basic Generation Serv., supra, 205 N.J. at 347, leeway is not a license to ignore the APA's requirements. The Board has discretion to utilize various procedures to fulfill its statutory mandate, but our Supreme Court has held that "administrative action, and an agency's discretionary choice of the procedural mode of action, are valid only when there is compliance with the provisions of the [APA] and due process." Ibid.; see also Airwork, supra, 97 N.J. at 300 ("If an agency determination or action constitutes an 'administrative rule,' then its validity requires compliance with the specific procedures of the APA that control the promulgation of rules."); Consider Distrib. of Casino Simulcasting Special Fund, 398 N.J. Super. 7, 16 (App. Div. 2008) ("An agency's ability to select procedures it deems appropriate is limited by 'the strictures of due process and of the [APA] . . . .'" (quoting In re Request for Solid Waste Util. Customer Lists, supra, 106 N.J. at 519)). Where, as here, the Board promulgates an administrative rule, it is

required to comply with the APA's requirements. <u>Provision of Basic Generation Serv.</u>, <u>supra</u>, 205 <u>N.J.</u> at 347. Because the Board failed to do so here, we are constrained to reverse the Board's order.

We are not persuaded that the Court's decision in <u>Provision of Basic Generation Service</u>, requires a different result. There, the Court applied the <u>Metromedia</u> factors to a Board order that in part allowed utility companies to pass through increased energy supplier costs to the ratepayers. <u>Id.</u> at 349-52. The Court found that the first five <u>Metromedia</u> factors supported a finding that the order constituted rulemaking and that the sixth factor "[did] not advance the analysis in any compelling way." <u>Id.</u> at 350-52. In weighing the factors, the Court determined that the preponderance of the "factors favor[ed] treating the [order] as akin to rulemaking" but that in adopting what the Court characterized as a "quasi-rule, the [Board] was entitled to greater flexibility with regard to procedural formalities <u>than if this process could only have been completed by way of a strict rulemaking process</u>." <u>Id.</u> at 352 (emphasis added).

Under those circumstances, the Court found the Board's use of a hybrid proceeding "which had attributes of rulemaking <u>and adjudicative proceedings</u> and included a legislative-type hearing, two opportunity-to-comment periods, discovery periods, and public hearings throughout the state, was sufficient to satisfy the

requirements of the . . . APA." Id. at 353 (emphasis added). But the Court expressly conditioned its conclusion upon the requirement that "evidentiary rate-setting hearings take place which apply to the cases of specific energy providers the principles to be established in" an ongoing contested case before the Board.[5] Ibid. Thus, the court allowed a departure from the APA's rulemaking requirements because the policy was going to be further defined in an ongoing adjudicated case.

Here, all the Metromedia factors clearly favor rulemaking. Therefore, unlike in Provision of Basic Generation Service, we address the requirements for the adoption of an actual, and not a quasi-rule, and the Board did not have the concomitant flexibility to depart from the APA's requirements. See id. at 352. Moreover, in its adoption of the modified CTA, the Board did not utilize the hybrid process the Court found provided the flexibility to abandon the requirements of formal rulemaking in Provision of Basic Generation Service.[6] The Board's order constitutes a general policy

---

[5] The ongoing contested case cited by the Court was In re Provision of Basic Generation Service for the Period Beginning June 1, 2008 — BGS SREC Recovery Mechanism Proceeding, BPU Docket No. ER07060379. Ibid.

[6] As an alternative to acting through rulemaking, adjudication or a hybrid proceeding, an agency may act informally. Request for Solid Waste Util. Customer Lists, supra, 106 N.J. at 518. "[I]nformal action constitutes the bulk of the activity of most

A-1153-14T1

that will be applied in future cases without the benefit of any of the adjudicatory proceedings the Court required in Provision of Basic Generation Service. See id. at 353.

"The purpose of APA rulemaking procedures is 'to give those affected by the proposed rule an opportunity to participate in the process, both to ensure fairness and also to inform regulators of consequences which they may not have anticipated.'" Id. at 349 (quoting In re Adoption of 2003 Low Income Hous. Tax Credit Qualified Allocation Plan, 369 N.J. Super. 2, 43 (App. Div.), certif. denied, 182 N.J. 141 (2004)). We find nothing in the Court's decision in Provision of Basic Generation Service supporting an abandonment of the well-settled principle that where an agency adopts a rule, it must proceed through formal rulemaking in accordance with the APA. Id. at 347; Airwork, supra, 97 N.J. at 300; Auth. For Freshwater Wetlands Statewide Gen. Permit 6, supra, 433 N.J. Super. at 413.

---

administrative agencies," "and the line between . . . rulemaking . . . , and informal action, . . . can become blurred." Ibid. However, informal action is defined as "statutorily authorized agency action that is neither adjudication nor rulemaking." Id. at 519. "[I]nformal agency action includes investigating, publicizing, planning, and supervising a regulated industry." Ibid. Here, the Board's order did not constitute informal action because, as noted, it satisfied each of the Metromedia factors and therefore constituted a rule that required rulemaking. Metromedia, supra, 97 N.J. at 332. It is only where "the APA does not require rulemaking [that] an agency may act informally." Ibid.; N.J.A.C. 7:1B-1.1 Et Seq., supra, 431 N.J. Super. at 133.

We are also persuaded that the Board's departure from the APA requirements constituted an "irregularity or informality [that] tends to defeat or impair the substantial right or interest of the appellant." N.J.S.A. 48:2-46. In the first instance, the Board's proceeding violated the ratepayers' right to have the new CTA policy adopted in accordance with the APA.

Second, although the Board's process provided opportunities for the submission of evidence and comment and the Board made certain submissions available on its website, the Board failed to comply with the APA's requirements that it publish "a description of the expected socio-economic impact of the rule," N.J.S.A. 52:14B-4(a)(2), and prepare and distribute a report "summarizing the content of the submissions and providing the [Board's] response to the data, views, comments, and arguments contained in the submissions," N.J.S.A. 52:14B-4(a)(4). We do not consider these APA requirements to be insubstantial. They require more of the Board than merely making information available on a website and requesting comment.

Compliance with the requirements provides the stakeholders with the Board's analysis and assessment of the economic impact of a proposed rule and the Board's response to a stakeholder's data, comments and arguments before a rule is adopted. Moreover, compliance provides the stakeholders with the opportunity to

present evidence and address the Board's economic impact assessment and response to the stakeholder's data, comments and argument. In other words, the statutory requirements guarantee that Rate Counsel and the stakeholders are fully informed of the Board's position concerning a rule's economic impact and the Board's response to the submitted data, comments and arguments, thus permitting Rate Counsel and the stakeholders an opportunity to present further evidence and argument. When the requirements are ignored, the Board gathers information and comment, but Rate Counsel and the stakeholders are deprived of the right granted by the APA to consider and contest the Board's assessment of economic impact and responses to the submissions prior to the adoption of a rule.

In our view, the Board's failure to comply with the requirements deprived Rate Counsel of substantial rights and interests under the APA: the right to obtain the Board's assessment of the economic impact of the proposed modified CTA and responses to Rate Counsel and the other stakeholders' submissions, and the right to provide evidence and argument in opposition to them. The failures are of particular significance here because of the conflicting evidence presented concerning the modified CTA's potential economic impact on ratepayers. We are therefore convinced that the Board's failure to comply with the APA's

requirements in its adoption of the modified CTA constituted an irregularity that tended to defeat and impair the rights and interests of Rate Counsel and the other stakeholders.

Because we reverse the Board's order, it is unnecessary to address the arguments that the Board's decision and order lacks sufficient support in the record or is otherwise contrary to applicable law. Any remaining arguments that we have not addressed directly are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION